No. 21-55994

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

ESTATE OF DANIEL HERNANDEZ, etc., et al,

Plaintiffs/Appellees,

v.

CITY OF LOS ANGELES, et al.,

Defendants/Respondents.

_____

On Appeal from an Order of the United States District Court
For the Central District of California
Honorable Judge Stanley Blumenfeld, Jr.
Case No. 2:20-cv-04477-SB (KSx)

_____

## OPENING BRIEF OF APPELLANTS ESTATE OF DANIEL HERNANDEZ, BY AND THROUGH SUCCESSORS IN INTEREST, MANUEL HERNANDEZ, MARIA HERNANDEZ AND M.L.H, MANUEL HERNANDEZ AND MARIA HERNANDEZ

# <u>REDACTED</u>

_____

Gerald P. Peters, Esq.
Law Office of Gerald Philip Peters
P.O. Box 6759
Thousand Oaks, CA 91359
(818) 706-1278

Arnoldo Casillas, Esq.
Casillas & Associates
3777 Long Beach Blvd., 3rd Floor
Long Beach, CA 90807
(562) 203-3030

Attorney for Appellants Estate of Daniel Hernandez, Manuel Hernandez and Maria Hernandez

# TABLE OF CONTENTS

Table Of Authorities ................................................................................................4

Statement Of The Case ..........................................................................................9

Statement Of Facts ..............................................................................................10

    The Patrol Car Video And McBride's Body Cam Video (Exhibits 5 And 6)

    Contradict McBride's Version Of Events …………...……………...……16

    LAPD Chief's Report To The Police Commissioners …………………...…26

    Report By Police Practices Expert Noble ...........................................29

    Firearms Criminalist Martini ............................................................31

    Forensic Pathologist Chapman .........................................................32

The Order Granting Summary Judgment...................................................33

    A. Objectively Reasonable.................................................................34

    B. Clearly Established Right................................................................37

    C. Fourteenth Amendment Claim.......................................................38

    D. *Monell* Claim................................................................................38

    E. State Law Claims …………………………………….…………39

The District Court Adopted Officer Mcbride's Version Of Events And Ignored

    Competing Evidence ............................................................................39

Statement Of Jurisdiction...................................................................................42

Standard Of Review .............................................................................................42

Statement Of Issues Presented For Review ..........................................................45

Summary Of Arguments .......................................................................................45

Argument ..............................................................................................................48

1. Introduction.....................................................................................................47

2. Officer McBride's Declaration And Recorded Statement Are Inconsistent With

    The Video Evidence. The Declaration And Recorded Interview Are Sometimes

    Inconsistent With Each Other …………………...…………………..………50

3. Excessive Force Cases Are Rarely Suited For Determination By Summary Judgment...........................................................................................................55

4. The District Court Erred In Concluding Officer McBride Was Protected By Qualified Immunity ..............................................................................................55

5. The District Court Erred In Concluding That The Number Of Shots Fired By Mcbride Is Immaterial ...........................................................................................61

6. The "Reasonableness" Of McBride's Actions Is Determined Based Upon The Events As They Unfolded, Viewing The Facts Most Favorably To The Hernandez Plaintiffs ..........................................................................................66

7. McBride's Actions Were Not Objectively Reasonable ......................................66

8. The Constitutional Right Is Clearly Established ................................................68

9. McBride's Decision To Shoot Hernandez Six Times,Without Any Warning, Was Not Reasonable ...............................................................................................72

10. Hernandez Plaintiffs' Fourteenth Amendment Claim Has Merit. The Third Through Six Shots Fired "Shock The Conscience" ............................................75

11. The Los Angeles Police Department Is A Separately Suable Entity ............77

12. The District Court Erred In Granting Summary Judgment as to the State Law Claims Since Mcbride's Acts Were Not Reasonable . Further, the District Court Did Not Consider That Reasonableness Under Section 1983 is Not Determinative of Reasonableness Under State Law ……………………….…………….....……77

13. Conclusion ………………………………………………………………79

Statement Of Related Cases …………………………………………………80

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*A.D. v. State of Cal. Highway Patrol,*
712 F.3d 446 (9th Cir. 2013) .............................................................75

*AGG v. City of Hayward,*
2020 U.S. Dist. LEXIS 189516 (N.D. Cal. 2020) ..............................65

*Bah v. City of New York,*
319 F. Supp. 3d 698 (S.D.N.Y. 2018) ...............................................63

*Banks v. Hawkins,*
999 F.3d 521 (8th Cir. 2021) ………...……………………………..68, 69

*Blanford v. Sacramento County,*
406 F.3d 1110 (9th Cir. 2005) …………………………..……………59, 60

*Boyd v. Benton County,*
374 F.3d 773 (9th Cir. 2004) ............................................................42

*Bryan v. McPherson,*
630 F.3d 805, 826 (9th Cir. 2010) ....................................................56

*Calderin v. Miami-Dade Police Dep't,*
600 Fed. Appx. 691 (11th Cir. 2015)..................................................74

*Chavez v. Las Vegas Metro. Police Dept.,*
2014 U.S. Dist. LEXIS 13012 (D. Nev. 2014) ..................................70

*Clayton v. Walker v. City of Orem,*
451 F.3d 1139, (10th Cir. 2006) .......................................................70

*Clipper Express v. Rocky Mountain Motor Tariff Bureau, Inc.,*
690 F.2d 1240 (9th Cir. 1982) ..........................................................43

*Craighead v. Lee,*
399 F.3d 954 (8th Cir. 2005) ............................................................67

4

*Darring v. Kincheloe,*
    783 F.2d 874 (9th Cir. 1986) ...............................................................42

*Deorle v. Rutherford,*
    272 F.3d 1272 (9th Cir. 2001) ...............................56, 57, 71, 73, 74

*Drummond v. City of Anaheim,*
    343 F.3d 1052, 1062 (9th Cir. 2003) ..............................................71

*Estate of Larsen ex rel. Sturdivan v. Murr,*
    511 F.3d 1255(10th Cir. 2008) .........................................................70

*Estate of Toribio v. City of Santa Rosa,*
    381 F.Supp.3d 1179 (N.D. Cal. 2019) ............................................58

*Estrada v. City of Las Cruces,*
    2010 U.S. Dist. LEXIS 165148 (D. N.M. 2010) ............................70

*Gantt v. City of Los Angeles,*
    717 F.3d 702 (9th Cir. 2013) ......................................................46, 75

*George v. Morris,*
    736 F.3d 829, 837 (9th Cir. 2013) ..................................................56

*Glenn v. Washington County,*
    673 F.3d 864 (9th Cir. 2011)..............................................56, 66, 73

*Graham v. Connor*
    490 U.S. 386 (1989)........................................................55, 56, 66

*Gravelet-Blondin v. Shelton,*
    728 F.3d 1086 (9th Cir. 2013) ..........................................................73

*Harris v. Roderick,*
    126 F.3d 1189 (9th Cir. 1997) ......................................46, 57, 69, 74

*Haugen v. Brosseau,*
    351 F.3d 372 (9th Cir. 2003) ............................................................73

*Hayes v. County of San Diego,*
    736 F.3d 1223 (9th Cir. 2013) ....................................................46, 73

*Headwaters Forest Def. v. County of Humboldt,*
  276 F.3d 1125 (9th Cir. 2002) ...........................................................71

*Hupp v. San Diego County*,
  2012 U.S. Dist. LEXIS 97664, (S.D. Cal. 2012) ..............................77

*Jean Baptiste v. Gutierrez*,
  627 F.2d 816 (11th Cir. 2010) .............................................................66

*Kisela v. Hughes*,
  138 S.Ct 1148 (2018) ...........................................................................38

*Ludwig v. Anderson*,
  54 F.3d 465 (8th Cir. 1995) .................................................................74

*Luna v. Mullenix*,
  765 F.3d 531 (5th Cir. 2014) ...............................................................64

*Maxwell v. County of San Diego*,
  697 F.3d 941 (9th Cir. 2012) ...............................................................42

*Mendez v. Cnty of L. A.*,
  815 F.3d 1178 (9th Cir. 2016) .............................................................68

*Nino v. United States*,
  334 F. Supp. 3d 1108 (S.D. Cal. 2018) …………………......….………68

*In re Ohio Execution Protocol Litig.*,
  2020 U.S. Dist. LEXIS 219570 (Oh. S.D. 2020) .............................76

*Padilla v. City of Alhambra*,
  2007 U.S. Dist. LEXIS 104051 (C.D. Cal 2007) .............................44

*Plumhoff v. Rickard*,
  572 U.S. 765 (2014) .......................................................36, 46, 61, 62

*Rodriguez v. City of Fresno*,
  819 F. Supp. 2d 937 ......................................................................78, 79

*Rodriquez v. City of Newark*,
  2018 U.S. Dist. LEXIS 217109 (N.D. Cal. 2018) ...........................45

6

*Santos v. Gates,*
    287 F.3d 846 (9th Cir. 2002) ..........................................................45, 55

*Scott v. Henrich,*
    39 F.3d 912 (9th Cir. 1994) ..........................................................43, 57, 69

*Smith v. City of Hemet,*
    394 F.3d 689 (9th Cir. 2005) ..........................................................56

*Stogner v. Sturdivant,*
    515 Fed. Appx. 280 (5th Cir. 2013) ……..…………………….…………….47

*Streit v. County of Los Angeles,*
    236 F.3d 552 (9th Cir. 2001) ..........................................................47, 77

*Tan Lam v. City of Los Banos,*
    976 F.3d 1003-03 (9th Cir. 2020) ..........................................................64

*Tennessee v. Garner,*
    471 U.S. 1 (1985) ..........................................................57, 66

*Thomson v. Salt Lake County,*
    584 F.3d 1304 (10th Cir. 2009) ..........................................................66, 72

*United States v. Place,*
    462 U.S. 696, 77 L. Ed. 2d 110, 103 S. Ct. 2637 (1983) ..........................66

*Zion v. County of Orange,*
    874 F.3d 1072 (9th Cir. 2017) ..........................................................37, 44, 69

**Federal Statutes**

42 USC § 1983 ..........................................................9, 43, 70
42 USC§ 1985(3) ..........................................................9
28 USC 1291 ..........................................................42

**U. S. Constitution**

Fourth Amendment ........................................................... 38, 55, 56, 57, 66

Fourteenth Amendment ...................................................... 45, 46, 75, 78

**California Statutes**

Civil Code
    § 51.7 ................................................................................9, 77
    § 52.1 ....................................................................................9

# STATEMENT OF THE CASE

The Estate of Daniel Hernandez, Manuel Hernandez, and Maria Hernandez ("Hernandez Plaintiffs") and M.L.H. filed a Consolidated Complaint, which sets forth claims for Excessive Force/Unreasonable Seizure (42 U.S.C. § 1983), Municipal Liability for Unconstitutional Customs and Practices (§ 1983); Interference with Familial Integrity Substantive Due Process Violation (§ 1983); Violation of Civil Rights (§ 1985 (3)); Assault & Battery; Wrongful Death; and Civil Rights Violations (Cal. Civ. Code §§, 51.7, 52.1) 8-ER-1810-1844.

All claims arise out of Police Officer Toni McBride's ("McBride") fatal shooting of Daniel Hernandez ("Hernandez"), who was holding a box cutter. McBride shot Hernandez six times, at a distance of 41 to 44 feet.

First, Hernandez walked at a moderate pace towards McBride. McBride shot Hernandez twice in the abdomen, knocking him to the ground. Hernandez tried to stand, but he was still on his hands and knees, McBride fired twice more, hitting Hernandez in the shoulder and thigh and, again, knocking him to the ground. While Hernandez was still on the ground, McBride shot two more times. The final shot, taken while Hernandez was prone, pierced the top of his head.

With prompt medical care, the first five shots were survivable, the head shot was not.

[**REDACTED**]

McBride, City of Los Angeles and Los Angeles Police Department (referred to collectively sometimes as "City") filed their Motion for Summary Judgment. 4-ER-721-903.

The Hernandez Plaintiffs opposed the Motion. 2-ER-299; 9-ER-1889-2033. The City replied. 2-ER-30-52.

The District Court granted the Motion for Summary Judgment. 1-ER-5-20.

## STATEMENT OF FACTS

*The City's Motion for Summary Judgment*

The Motion is based on the Declarations of Toni McBride, attorney Smith and attorney Gilbert.

McBride is the only percipient witness providing a declaration for the Motion. McBride authenticated the video from her body-worn camera (Exhibit A) and the video from the patrol car recorder (Exhibit B).[1] 4-ER-849:10-19, 854, 856.

---

[1] There is no declaration from Officer Shuhei Fuchigami, McBride's partner. Within seconds after McBride shot Hernandez, three other police officers ran up to McBride (approximately 2:48 of the patrol car video. Exhibit 5 to Gastelum

Attached as Exhibit C to Smith's Declaration is a video by bystander Pineda. 4-ER-836: ¶¶ 2, 4.

Attorney Smith authenticates photographs, the Pineda video, and a screenshot from the video. 4-ER-836. Attorney Gilbert authenticates documents only, except for a brief narrative regarding interrogatories served on the Hernandez Plaintiffs. 4-ER-767-768.

McBride and her partner, Officer Fuchigami, were dispatched to a call for service regarding a separate incident. While en route, they saw a crowd at the intersection of San Pedro and 32nd Street, which was gathered around a traffic accident. McBride and Fuchigami responded to the collision. 4-ER-849: 5-9.

As McBride exited the patrol car, she saw "multiple individuals," many of whom were screaming and yelling, and several damaged vehicles with people still inside. She estimates there were fifty people in the vicinity. 4-ER-849: 20-23.

Five or six people immediately told McBride there was a "crazy guy with a knife" in the black truck which appeared to have been "involved" in the traffic

---

Declaration). There are no declarations from these officers, who are not mentioned in the Motion. Presumably, the officers were in close proximity with McBride when she, alone, shot Hernandez.

collision. They also told McBride the man was threatening to hurt himself and others. 4-ER-849: 24-28.

Hernandez was rummaging through the truck's middle console. Based on Hernandez's "furtive movements," information provided over the radio broadcast, reports from individuals at the scene, and her own observations, McBride believed Hernandez was armed with a weapon and was threatening to harm either himself or others. In response, McBride directed bystanders to clear out of the area. 4-ER-850:1-7.

Hernandez climbed out of the truck's driver side window. McBride called to him, stating "Hey man, let me see your hands. Let me see your hands, man." 4-ER-850:10-13.

Hernandez appeared from behind the rear of the truck and "began advancing" towards McBride, while holding a knife in his hand. As Hernandez "quickly closed in" on McBride, she ordered him to "Stay right there. Drop the knife." 4 -ER-850: 4-16. Simultaneously, McBride gestured with her left hand for Hernandez to stop. Hernandez "continued to advance while clutching a knife." 4-ER-850:14-19.

McBride backed up and, again, ordered Hernandez to drop the knife. 4-ER-850:20-23.

Based on her training and experience, McBride concluded Hernandez was under the influence of drugs – "likely either methamphetamine or PCP." 4-ER-850:24-26.

As Hernandez advanced towards McBride, he held a knife in his right hand. He was "rapidly closing the distance between [them]." McBride's concern for herself, her partner, and the crowd's safety "escalated." Hernandez said, "I'm not going to drop this knife." 4-ER-851:3-7.

McBride "believed Hernandez posed an imminent threat to not only [her] own life, but also the lives of others at the scene." 4-ER-851:8-10.

McBride raised her weapon from the "low-ready position" and pointed it at Hernandez, again yelling, "Drop it." Hernandez did not comply and "progressed even closer to McBride and bystanders standing in close proximity. 4-ER-851:11-15.

McBride fired two rounds at Hernandez. "Although [Hernandez] initially fell to the ground, he immediately jumped up and into a crouched position that appeared to be a sprinter's stance while screaming with rage." 4-ER-851:6-18.

McBride, again, yelled "drop it." Hernandez did not comply. 4-ER-517: 19-21.

As Hernandez rose up and continued advancing towards McBride, she fired a third and fourth round at him. Hernandez fell on his back "before rotating onto his side while appearing to again get up and continue his advance towards [McBride]

. . ." 4-ER-851:22-27.

Then, McBride fired a fifth and six shot, "which resulted in Hernandez immediately falling to and remaining on the ground." 4-ER-852:1-2. A few seconds after the final shot, additional officers rush forward to join McBride and move closer to Hernandez's body. 4-ER-852:3-6.

None of the videos are mentioned in the "Factual Background" section of the Motion. 4-ER-879-882. The Motion mentions the videos only to state they evidence the "destruction and injuries Hernandez caused only moments before officers arrived at the scene." 4-ER-887:24-25. The Motion does not direct the reader to the videos as comprehensive and unbiased evidence. In the Motion, the videos do not exist.

The Separate Statement mentions the videos, but the descriptions the City provides are misleading. 4-ER-859-863. The Separate Statement does not mention McBride's partner or other police officers present at the scene. The Undisputed Facts do not provide Hernandez's distance from McBride or describe where bullets struck Hernandez. To make Hernandez more threatening, the City describes him as holding a knife, despite knowing he was holding a boxcutter. 4-ER-859:24, 860:8, 861:5, 862:10, 18.

After the second shot, the City states Hernandez "immediately came back up into a *crouched, sprinter's stance* while screaming in rage." 4-ER-861:23-24.

emphasis added. Not true. Hernandez did not get into a "crouched, sprinter's stance." He used his hands and knees to try to stand up. McBride shot him two more times before he could fully stand.

After the fourth shot, "Hernandez fell to his back, quickly rotating to his side, still holding the knife, *while appearing to get up and continue his advance* toward Officer McBride." 4-ER-862:10-11, emphasis added. This is not true. Hernandez did not appear to get up or continue his "advance" towards McBride. At this point, he had been shot twice in the abdomen and in his thigh and shoulder. Hernandez did not get off the ground before McBride shot him shot two more times, in the upper back and top of his head.

The Motion does not present:

- expert testimony (police practices, forensic, or medical);
- the transcript of McBride's interview by the Los Angeles Police Department;
- the Chief of Police's Report to the Los Angeles Police Commission;
- declarations from other officers on the scene, including McBride's partner.
- bystander declarations.

The Hernandez Plaintiffs' evidence includes the videos from the patrol car's video recorder and McBride's body camera (Exhibits 5 and 6), the reports of a medical expert (Chapman), firearms forensic expert (Martini), and police practices expert (Noble), and the Report of the Chief of Police to the Board of Police Commissioners. 3-ER-570-579, 580-618, 570-579, 9-ER-1969-2022.

[REDACTED]

This finding is not mentioned in the District Court's Order.

## THE PATROL CAR VIDEO AND MCBRIDE'S BODY CAM VIDEO (EXHIBITS 5 AND 6) CONTRADICT MCBRIDE'S VERSION OF EVENTS

Police videos directly contradict McBride's version of events.

Hernandez did not approach McBride at a "rapid pace." He walked at a normal pace. As he walked, he raised his arms to the side of his body. He appeared somewhat unsteady on his feet.

When Hernandez was 41 to 44 feet from McBride, she shot twice, hitting him in the abdomen with both shots. Hernandez fell to the ground.

Quickly, Hernandez tried to get back up, pushing off the ground with his hands and feet. While Hernandez's hands were still touching the ground, McBride shot

two more times, hitting Hernandez in the thigh and shoulder. Hernandez never stood up and did not take any steps towards McBride.

After being shot, again, Hernandez immediately fell to the ground and rolled onto his side. He did not get up. McBride shot two more times while Hernandez was on the ground, hitting him in his back and the top of his head. When the final shot was fired, Hernandez was prone on the ground.

*See photos, below*, screen shots at 03:02-03:08 (six seconds) from McBride's the police car video,  Gastelum Declaration, Exhibit 5. Photos 1 and 2 depict the first and second shots, with Hernandez beginning to fall. (Note the police officer, likely Officer Fuchigami, to Hernandez's right, next to the light pole. He does not appear to have his gun drawn.) Photo 3 depicts Hernandez as he falls on his back. In Photo 4, Hernandez attempts to stand immediately before he is shot a third time. (Note the police officer next to the driver's door of the white car.) Photo 5 depicts Hernandez falling after being struck by McBride's fourth shot. Photo 6 depicts Hernandez on his back. In Photo 7, Hernandez rolls onto his side, as the fifth shot is fired, and, then, onto his stomach (Photo 8), as the final shot is fired. (Note the officer running on the sidewalk in McBride's direction.)


Photo_001

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER
Estate of Daniel Hernandez, et al. vs. City of Los Angeles, et al.
USDC Case No. 20-CV-04477 SB (KSx)



Photo_003

2020-04-29 00:38:47Z
AXON BODY 2 X81049574

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER
Estate of Daniel Hernandez, et al. vs. City of Los Angeles, et al.
USDC Case No. 20-CV-04477 SB (KSx)









Photo_007

2020-04-23 T00:38:51z
AXON BODY 2 X81049674

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER
Estate of Daniel Hernandez, et al. vs. City of Los Angeles, et al.
USDC Case No. 2020CV-14477 SB (KSx)



**LAPD CHIEF'S REPORT TO THE POLICE COMMISSIONERS**

**[REDACTED]**

**[REDACTED]**

**[REDACTED]**

**[REDACTED]**

**REPORT BY POLICE PRACTICES EXPERT NOBLE**

Immediately before shots five and six, bystander Jasmin Sierra was 26 feet from Hernandez. 4-ER-631, ¶32.

Noble opined as follows:

> While Hernandez presented a risk, he did not present an imminent threat of death or serious bodily injury at the moment that Officer McBride fired her first two rounds. Officer McBride estimated Hernandez was 15 feet away from her . . . However, the investigation revealed that Hernandez was 41 feet away. Police officers are trained that suspects armed with edged weapons can cover short distances

very quickly, but they are trained to recognize the risks of distance and to mitigate those risks by drawing their firearms and seeking cover if possible, particularly if the suspect is within 21 feet of them. Here, Officer McBride had her handgun drawn and pointed at Hernandez, but it is my opinion that Hernandez did not present an imminent threat to Officer McBride in these circumstances when he was 41 feet away from her.

It is my opinion that Officer McBride's first two rounds were objectively unreasonable . . .

4-ER-634, ¶¶44, 45.

The video shows that Hernandez was trying to stand back up immediately after being shot the first two times. Officer McBride's third shot was fired while Hernandez's knees were slightly off the ground and his right hand was still in contact with the ground. . . Officer McBride's fourth shot struck Hernandez after he fell to the ground subsequent to the third shot. Hernandez was on his back on the ground at the moment of the fourth shot.

Because Hernandez was 43 feet away from Officer McBride, he had not yet stood upright at the moment of the third shot and was on the ground at the moment of the fourth shot, it is my opinion that Hernandez did not

present an imminent threat of death or serious bodily injury to Officer McBride or others and McBride's third and fourth shots were objectively unreasonable . . .

4 -ER-635, ¶¶47,48.

The video shows that Hernandez was on the ground and had his back toward Officer McBride at the moment of the fifth and sixth shots. The video does not show Hernandez . . . about to pop up prior to either the fifth or sixth shots. Hernandez did not present an imminent threat or serious bodily injury Officer McBride or anyone else at the moment of fifth or sixth shots. Moreover, Hernandez was 44 feet away from Officer McBride. Thus, it is my opinion that Officer McBride's fifth and sixth rounds were objectively unreasonable . . .

4-ER-635, ¶50.


## FIREARMS CRIMINALIST MARTINI

Shots 1 through 6 were fired in 6.18 seconds. The first 2 shots were fired in 0.73 seconds, followed by a pause of 2.52 seconds. The third and fourth shots were fired in 0.73 seconds, followed by a 1.36 second pause. The last two shots were 0.83 seconds apart. 3-ER-584-585.

The first shot hit Hernandez in the right lower abdomen. The second shot struck his forearm and re-entered his lower left abdomen. 3-ER-591, second full paragraph. Image 4. 3-ER-591.

The third shot hit Hernandez's right thigh, while he was pushing up off the street, with his hands extended to the ground. The fourth shot hit his right shoulder as he fell, with buttocks on the ground. 2-ER-585, second full paragraph. Image 5. 2-ER-592.

The fifth round hit Hernandez's left upper back, while he was on the ground, with knees curled in a "crunch" position. The final shot struck Hernandez in the right top of his head, while he was nearly prone. 3-ER-586, second full paragraph. Image 6. 3-ER-593.

Hernandez was 41 to 44 feet from McBride. 3-ER-587, fifth full paragraph. Hernandez's movements were primarily towards the west. 3-ER-587, third full paragraph.


## FORENSIC PATHOLOGIST CHAPMAN

The first shot pierced Hernandez's right inferior abdomen, and the second shot produced two wounds: a perforating wound of the left forearm and a re-entry wound to the left abdomen.  The wound to Hernandez's right thigh was likely caused by the third round fired. The fourth round likely struck his right shoulder.

The fifth round most likely struck Hernandez's left upper back. The sixth round more likely than not struck his head. 3-ER-572-573.

The head wound was immediately fatal. The next most serious wound was the wound to the right shoulder (fourth shot) that involved the lung and liver. It would not, however, have produced immediate death. With immediate expert treatment, this wound may have been survivable. 3-ER-574.

## THE ORDER GRANTING SUMMARYJUDGMENT

In the "Background" section, the Court states bystanders reported Hernandez was "threatening to hurt . . . others." 1-ER-006, ¶2. Other than McBride's Declaration and her interview, no evidence supports this statement. See the videos in which bystanders casually watch the confrontation.

The Order states Hernandez walked with his arms raised towards McBride. "Decedent continued to advance towards Officer McBride brandishing the knife in his hand with his arms in a raised position." 1-ER-007, ¶2. In fact, after several steps, Hernandez raised his hands *to the side*, away from his body, not towards McBride. See patrol car video, Exhibit 5.

The Order then states, "After Decedent again refused to comply and continued to advance, Officer McBride, believing Decedent posed an imminent threat to her life and the lives of the bystanders, fired two rounds at Decedent." 1-ER-007, ¶2.

Hernandez was 41 to 44 feet away McBride, and there were other police officers present, none of whom fired their weapons.

Next, the Order states, "Decedent fell to ground, but immediately got up, and in a crouched stance, *attempted* to move toward Officer McBride." 2-RT-007. ¶2, emphasis added. Hernandez tried to stand up, managed to straighten his arms, while his knees were on the ground. Hernandez was shot before he could "attempt" more.

Finally, the Order states, "After Decedent fell on his back and rolled over on his side, still holding the knife and seemingly *attempting to get up*, McBride fired two final rounds at Decedent." 1-ER-007, ¶2, emphasis added. Hernandez rolled over. Nothing more.

## A. OBJECTIVELY REASONABLE

The Order states, "Officer McBride reasonably could have construed Decedent's acts leading up to the shooting to constitute serious criminal conduct." 1-ER-010, first full paragraph.

"After refusing several commands to drop the knife and stay put, Decedent continued to advance toward Officer McBride, with his arms outstretched . . . Only after she was faced with Decedent's refusal to drop his weapon did Officer McBride fire her weapon, and only after Decedent continued to refuse to drop the

weapon after being shot and told to drop the weapon did she discharge her weapon again. Under these undisputed circumstances, Officer McBride reasonably concluded that Decedent posed a serious threat." 1-ER-011, first full paragraph. Note that the District Court did not conclude Hernandez posed an "imminent" threat.

The District Court rejected the Hernandez Plaintiffs' argument that Hernandez was too far from Officer McBride to present an immediate threat. "This argument is unpersuasive because Decedent was advancing and had ignored repeated commands to stop and drop his knife . . Indeed, the Ninth Circuit has rejected this distance-related argument, finding that a suspect who is 55 feet away can still pose an immediate threat because he can cover the distance in a matter of seconds." 1-ER-011, ¶3.

In the videos, Hernandez, before McBride shot him, was moving forward at a moderate walking pace. There is nothing in the video which suggests Hernandez could "cover the distance [of 44 feet]. . . in a matter of seconds." Further, after McBride shot Hernandez twice in the abdomen, he tried to stand, but did not advance. There is nothing to suggest that, after being shot twice, Hernandez could "cover the distance [of 44 feet]. . . in a matter of seconds." Exhibits 5 and 6.

Once Hernandez was on the ground, having been shot four times, including in his right thigh, there is nothing to suggest he could "cover the distance [of 44 feet].

. . in a matter of seconds." Rather, the final two shots were in the nature of a public execution of a defenseless man.

The District Court refused to confront the issue raised by Officer McBride's decision to shoot Hernandez six times, including the final shots when he was on the ground. The District Court quoted *Plumhoff v. Rickard*, 572 U.S. 765, 777-78 (2014) ("It stands to reason that, if police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting *until the threat has ended.*" 1-ER-012, first full paragraph, emphasis added. The District Court ignored the final phrase – "until the threat has ended."

The District Court could not reasonably conclude the threat continued after Hernandez was shot two times and then, two more times.

The Order does not state Hernandez attempted to advance quickly after he was shot the first two times. Rather, "Even after the first two shots, Decedent remarkably *continued to rise* in the direction of the officer." 1-ER-012, second full paragraph, emphasis added.

The Order continues, "The question is not whether another officer might have waited to evaluate the rising man's next move to see if he would stop, charge at the officer, or advance towards the crowd." 1-ER-013, second full paragraph. Since there is an objective standard for determining the existence of an imminent threat, why is that not the question?

The videos demonstrate Hernandez never "advance[d] towards the crowd." As the videos attest, Hernandez never "charge[d] at the officer." Considering Hernandez had already been shot twice in the torso and was only "continu[ing] to rise," what objective facts demonstrate he presented a serious, imminent threat?

The Order does not discuss the presence of multiple police officers, none of whom shot at Hernandez. Instead, the District Court resorted to hyperbolae. "If anything, Decedent's apparent mental state objectively increased the threat assessment. He had just crashed into a vehicle, a reckless act that caused substantial damage; and he emerged from the wrecking in a *seemingly crazed and plainly dangerous and menacing state*, as he advanced towards an officer who had her gun drawn and was voicing commands *that made no impression on him*." 1-ER-011, ¶1, emphasis added.

## B. CLEARLY ESTABLISHED RIGHT

The District Court concluded McBride did not violate a clearly established right. 1-ER-014, first full paragraph. The Court discussed *Zion v. County of Orange*, 874 F.3d 1072, 75-76 (9th Cir. 2017), as follows. "The Ninth Circuit found that the officer's use of deadly force by shooting the decedent – and then stomping on his head . . . was not objectively reasonable . . . *Zion* did not put Officer McBride on notice that the use of deadly force, including the firing of the fifth and

sixth shots, was unconstitutional under the circumstances she faced."] 1-ER-015,

¶1. The Court did not explain how stomping on a helpless man's head is

qualitatively different than shooting him in the head. The District Court also

rejected the argument that an officer who violates department policy is not entitled

to qualified immunity. 1-ER-016, second full paragraph. The Court relied on

*Kisela v. Hughes*, 138 S.Ct 1148 (2018) in which police officers shot a woman

who "approached another person (her roommate) while holding the knife, stopping

no more than *six feet* away." 1-ER 016-17. Hernandez was more than 40 feet from

Officer McBride.

## C. FOURTEENTH AMENDMENT CLAIM

The shooting of Daniel Hernandez did not "shock the conscience" since "the

shooting did not violate Fourth Amendment standards or otherwise warrant

protection under the qualified immunity argument." 1-ER 017-18.

## D. *MONELL* CLAIM

There was no underlying constitutional violation, and there was no evidence a

municipal policy, practice, or custom was a "moving force behind [the] violation

of constitutional rights." 1-ER-018-19.

## E. STATE LAW CLAIMS

The Court concluded that, since McBride's conduct was reasonable with regard to a Federal constitutional violation, there was no violation of State law. 1 - ER-20.

## THE DISTRICT COURT ADOPTED OFFICER MCBRIDE'S VERSION OF EVENTS AND IGNORED COMPETING EVIDENCE

The District Court's Order aligns perfectly with Officer McBride's Declaration and ignores the competing evidence. For example, the Order makes no reference to the contradictions between McBride's statements and the video evidence, the Police Chief's Report or the Hernandez Plaintiffs' experts.

There is no independent evidence which supports McBride's version of events. The Motion for Summary Judgment contains no declarations from other police officers or bystanders. The Order mentions video evidence only once, in a footnote, and does not refer to that evidence. 1-ER-005, fn. 2.

| McBride's Declaration | The District Court's Order |
|---|---|
| 1. "I was also advised by the bystanders that the individual in the black truck was threatening to hurt | 1. "Five or six bystanders immediately told Officer McBride . . . that he was threatening to hurt himself *and others*. |

38

| | |
|---|---|
| both himself *and others*." 4-ER-849:26-28, emphasis added. | 1-ER-006: second full paragraph, emphasis added. |
| 2. "As Hernandez quickly closed in on me, I ordered him to 'Stay right there. Drop the knife.' " 4-ER-850:15-16. | 2. "As Decedent closed the distance, Officer McBride ordered him to 'Stay Right there' and 'Drop the knife' . . ." 1-ER-006: first full paragraph. |
| 3. ". . . I believed Hernandez posed an *imminent threat* to not only my own life, but *also the lives of others at the scene*." 4-ER-851:9-10, emphasis added. | 3. "Officer McBride, believing Decedent posed an *imminent threat to her life and the lives of the bystanders*, fired two shots." 1-ER-007: second paragraph, emphasis added. |
| 4. "When Hernandez refused to comply and as he progressed even closer to both me and the bystanders who were standing in close proximity, I feared that Hernandez posed an imminent threat." 4-ER-851:13-15. | 4. "After Decedent again refused to comply and continued to advance, Officer McBride, believing he posed an immediate threat to her life and the lives of the bystanders, fired two shots." 1-ER-007: second paragraph. |
| 5. "At that point, I fired two rounds at Hernandez. Although he initially fell to the ground, Hernandez immediately | 5. "Decedent fell to ground, but immediately got up, and in a crouched stance, attempted to move towards |

| | |
|---|---|
| jumped up and into a crouched position that *appeared to be a sprinter's stance while screaming in rage.*" 4-ER -851:16-18, emphasis added. | Officer McBride." 1-ER-007: second paragraph. |
| 6. "After observing Hernandez *rising up into a sprinter's stance and appearing to continue towards me* while still holding a knife." 4-ER-851:19-20, emphasis added. | 6. "Decedent fell to ground, but immediately got up, and in a crouch stance, attempted to move towards Officer McBride. 1-ER-007: second paragraph. |
| 7. "As Hernandez rose up and continued advancing towards me, I fired a third and fourth round at him, which resulted in Hernandez falling on his back before rotating on his side while appearing to again get up and continue his advance towards me, still tightly holding the knife. 4-ER-851:14-27. | 7. "After Decedent . . . continued to advance, Officer McBride, believing Hernandez posed an immediate threat to her life and the lives of the bystanders, fired two shots. 1-ER-007: second paragraph. |

The Order does not reference the Hernandez Plaintiffs' evidence.

For example, Martini, a firearms criminalist states, "For all six shots, Mr. Hernandez was at a distance of approximately 41 to 44 feet from Officer McBride." 3-ER-587: fifth full paragraph. So, from the first shot to the sixth shot, Hernandez moved, at most, 3 feet towards McBride. Hardly a "fast advance" over the 6.17 to 6.18 seconds which elapsed. Hernandez moved at a maximum speed of one-half foot per second. At that rate, it would have taken him at least 82 seconds to reach Officer McBride.

## STATEMENT OF JURISDICTION

The District Court's entry of judgment in favor of appellees is appealable. 28 United States Code § 1291.

## STANDARD OF REVIEW

The appellate court reviews the district court's rulings on qualified immunity de novo. *Maxwell v. County of San Diego*, 697 F.3d 941, 947 (9th Cir. 2012). Whether plaintiff's federal rights were clearly established at the time of the alleged violation is a question of law. *Boyd v. Benton County*, 374 F.3d 773, 778 (9th Cir. 2004).

An appellate court reviews a grant of summary judgment de novo to determine whether there is any genuine issue of material fact and whether the substantive law was correctly applied. *Darring v. Kincheloe*, 783 F.2d 874, 876 (9th Cir. 1986). All

facts in the record and inferences drawn from them must be viewed in the light most favorable to the non-moving party. *Clipper Express v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1250 (9th Cir. 1982).

"To reject a defense of qualified immunity, we must find that 'the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates the right.' " *Id.*, quoting *Saucier*, 533 U.S. at 202. "[D]efendants can still win on summary judgment if the district court concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances."

The Motion for Summary Judgment relies entirely on McBride's declaration. *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994) warns against relying entirely on the police officer's version of events in a deadly force case:

> Deadly force cases pose a particularly difficult problem under this regime because the officer defendant is often the only surviving eyewitness. Therefore, the judge must ensure that the officer is not taking advantage of the fact that the witness most likely to contradict his story - the person shot dead - is unable to testify. The judge must carefully examine all the evidence in the record, such as medical reports, contemporaneous statements by the officer and the available physical evidence, as well as any expert testimony proffered by the

plaintiff, to determine whether the officer's story is internally

consistent and consistent with other known facts. *Hopkins*, 958 F.2d at

885-88; *Ting v. United States*, 927 F.2d 1504, 1510-11 (9th Cir.

1991). In other words, the court may not simply accept what may be a

self-serving account by the police officer. It must also look at the

circumstantial evidence that, if believed, would tend to discredit the

police officer's story, and consider whether this evidence could

convince a rational factfinder that the officer acted unreasonably.

*See*, *Zion v. Cty. of Orange*, 874 F.3d at 1076, *supra* ["Higgins testified that Zion

was trying to get up. But we 'may not simply accept what may be a self-serving

account by the police officer.' . . . This is especially so where there is contrary

evidence. In the video, Zion shows no signs of getting up. . . This is a dispute of

fact that must be resolved by a jury."]

   "In deciding defendants' motion for summary judgment, the court 'draw[s] all

reasonable inferences that can be drawn from the video in [Padilla's] favor.'

" *Padilla v. City of Alhambra*, 2007 U.S. Dist. LEXIS 104051, *2-6 (C.D. Cal

2007). "At a minimum, [however, the Court] must be mindful that [the

surveillance video] provides an important basis for a jury to question the credibility

and accuracy of [Officer Rodgers'] account[]. . . see also Scott, 550 U.S. at 380-

81 (where a party's version of events is 'blatantly contradicted' by video evidence,

it is error to rely on the 'visible fiction' of that party's account)." *Rodriquez v. City of Newark*, 2018 U.S. Dist. LEXIS 217109, *33-34 (N. D. Cal. 2018).

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1. Whether the District Court erred in granting summary judgment by finding McBride is entitled to qualified immunity as to the Estate's section 1983 claim?

2. Whether Officer McBride's use of deadly force objectively reasonable for all shots she fired?

3. Whether Officer McBride is protected by qualified immunity for all shots fired?

4. Whether Officer McBride's acts "shock the conscience," such that the Hernandez Plaintiffs have a viable Fourteenth Amendment claim?

5. Whether the conspiracy claim precluded as a matter of law?

6. Whether the Hernandez Plaintiffs' state law claims are barred?

## SUMMARY OF ARGUMENTS

McBride's Declaration is wildly inconsistent with video recordings of her confrontation with Hernandez, the Police Chief's report, and experts' reports.

Excessive force cases against police officers are rarely suitable for determination by the Court. *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002).

The District Court erred in concluding McBride was protected by qualified privilege. There is no evidence Hernandez presented an imminent threat of harm to McBride or others. *Harris v. Roderick*, 126 F.3d 1189, 1204 (9th Cir. 1997). In all cases cited in the Motion for Summary Judgment, the suspect was far closer the police officers or civilians.

McBride's decision to shoot Hernandez was not objectively reasonable. Even if it could be plausibly contended Hernandez presented at imminent threat at 41 to 44 feet, which appellants dispute, he did not present an imminent threat after he had been shot twice in the abdomen. Hernandez did not fully rise from the first two shots before McBride fired two more shots. He was not moving towards McBride or the bystanders. The fifth and sixth shots, fired while Hernandez was prostrate on the ground, were a public execution. Police officers must stop shooting when the imminent threat ends. *Plumhoff v. Rickard*, 572 U.S. at 777-78, *supra.*

An officer's failure to warn before using deadly force is a significant factor in assessing the reasonableness of the officer's conduct. *Hayes v. County of San Diego*, 736 F.3d 1223, 1234 (9th Cir. 2013).

Due process violations under the 14th Amendment occur when official conduct "shocks the conscience." *Gantt v. City of Los Angeles*, 713 F.3d 702, 707 (9th Cir. 2013.)

LAPD is a separately suable entity. *Streit v. County of Los Angeles*, 236 F.3d 552, 565 (9th Cir. 2001).

The District Court erred in dismissing the State Law claims because McBride's acts were not reasonable. *Stogner v. Sturdivant*, 515 Fed. Appx. 280, 283 (5th Cir. 2013).

## ARGUMENT

## 1. INTRODUCTION

On April 22, 2020, Daniel Hernandez, holding a box cutter (not a knife), walked at a moderate pace towards Officer McBride. As he walked forward, Hernandez appeared to grow unsteady. He was shot six times, at distances of 41 to 44 feet, by Officer Toni McBride. Other police officers who were present did not shoot. Hernandez died. While Hernandez might have survived the first five shots, the sixth shot, a "head shot," caused immediate death. The last two shots were a summary execution of Hernandez, who was prone on the street surface.

McBride, the City of Los Angeles, and the Los Angeles Police Department filed a Motion for Summary Judgment. Instead of a dispassionate fact-driven narrative, the Motion begins with a semi-hysterical rant, filled with hyperbolae. Thus, the Motion refers to Hernandez as "crazed," (4-ER-879:12), states he caused a "horrific car crash" (4-ER-879:14), and editorializes that "dozens of bystanders watched in terror" (4-ER-879:15) as Hernandez "focus[ed] his ill-intents on Officer McBride (4-ER-879:16).

McBride is depicted as the calm heroine of this drama who "finally stopped Hernandez's assault." 4-ER-879:22. With no evidence in the record, the Motion hypothesizes that Hernandez "appears to target a vehicle waiting to make a left

turn" and "[w]hile holding the accelerator to the floor, Hernandez smashed into the rear of a small vehicle rendering it almost unrecognizable and propelling it across the intersection." 4-ER-880:4-6.

Although there is no evidence supporting Officer McBride's bare claim that Hernandez threatened to hurt others, the Motion states Hernandez was "threatening not only bystanders. . ." and "threatening both himself and bystanders." 4-ER-880:20-21; 883:1.

Instead of stating Hernandez, after being shot twice, partially rose, with his hands and knees still on or near the ground, the Motion depicts him as "raising himself into what appeared to be a sprinter's stance in an apparent effort to continue towards McBride." 4-ER-881:26 – 882:1. As if a person who has been shot twice in the abdomen with a 9 mm. pistol, at 41 to 43 feet, can "sprint."

Next, the Motion descents into pure fiction. "McBride then fired a third and fourth round at Hernandez . . . who fell onto his back before rotating on his side while appearing *to again get up and continue his advance on her. . .*" 4-ER-882:2-4, emphasis added. This is fiction. After Hernandez fell on his back, his only movement was to roll over. Hernandez was prone on the ground when McBride shot him two more times. The sixth shot was a fatal "head shot."

The District Court granted the Motion for Summary Motion, finding McBride is entitled to qualified immunity.

## 2. OFFICER MCBRIDE'S DECLARATION AND RECORDED INTERVIEW ARE INCONSISTENT WITH THE VIDEO EVIDENCE. THE DECLARATION AND RECORDED INTERVIEW ARE SOMETIMES INCONSISTENT WITH EACH OTHER

**[REDACTED]**

**[REDACTED]**

**[REDACTED]**

**[REDACTED]**

**[REDACTED]**

### 3. EXCESSIVE FORCE CASES ARE RARELY SUITED FOR DETERMINATION BY SUMMARY JUDGMENT

Excessive force cases are rarely suited for summary judgment. "Because [the excessive force inquiry] nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Santos v. Gates*, 287 F.3d at 853, *supra.*

### 4. THE DISTRICT COURT ERRED IN CONCLUDING MCBRIDE WAS PROTECTED BY QUALIFIED IMMUNITY

In determining whether an officer's actions were reasonable, courts balance the "nature and quality of the intrusion" on the individual's Fourth Amendment interests against the "countervailing governmental interests at stake." *Graham v, Connor*, 490 U.S. 386, 396 (1989).

In *Graham*, the Supreme Court listed factors to determine the reasonableness of the use of force under the Fourth Amendment including: (1) the severity of the crime, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *Graham*, *supra*, 490 U.S. at 396. "The most important single element of the three specific factors" is "whether the suspect poses an immediate threat to the safety of the officers or others." *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005). In particular, "objective facts must indicate that the suspect poses an immediate threat to the officer or a member of the public." *Bryan v. McPherson*, 630 F.3d 805, 826 (9th Cir. 2010).

The *Graham* factors are not exhaustive. *George v. Morris*, 736 F.3d 829, 837–38 (9th Cir. 2013). Courts are to "examine the totality of the circumstances and consider 'whatever specific factors may be appropriate in a particular case, whether or not listed in Graham.' " *Bryan*, *supra*, 630 F.3d at 826. Police officers also must consider less intrusive alternatives to the force that was used. *Glenn v. Washington County*, 673 F.3d 864, 872 (9th Cir. 2011).

If a suspect is emotionally disturbed, that is a factor which "must be considered." *Deorle v. Rutherford*, 272 F.3d 1272, 1283 (9th Cir. 2001). Here, McBride concluded, from Hernandez's behavior, that he was under the influence of drugs - "likely either methamphetamine or PCP." 4-ER-516:24-26. The tactics

employed by officers are an important consideration in cases involving individuals who are mentally ill or emotionally distrubed. *Id.* at 1282-1283.

The use of deadly force implicates the highest level of Fourth Amendment interests both because the suspect has a "fundamental interest in his own life" and because such force "frustrates the interest of the individual, and of society, in judicial determination of guilt and punishment." *Tennessee v. Garner*, 471 U.S. 1, 9 (1985). Accordingly, "[a]n officer's use of deadly force is permissible only if 'the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.' " *Scott v. Henrich*, 39 F.3d 912, 914 (9th Cir. 1994). "Law enforcement officials may not kill suspects who do not pose an immediate threat to their safety or to the safety of others simply because they are armed." *Harris v. Roderick*, 126 F.3d at 1204, *supra.*

There is no evidence Hernandez presented an "immediate threat" to bystanders. In her declaration, McBride states 5 or 6 bystanders told her Hernandez said he wanted to hurt bystanders. However, other evidence does not support this self-serving claim.

Second, it is disputed whether Hernandez presented an "immediate" threat to Officer McBride, who was 41 to 44 feet away. The Motion does not discuss other police officers who were present on the scene, including McBride's partner. Where were they and what were they doing? The Motion provides no evidence.

56

When Hernandez was shot the first two times, he was 41 to 44 feet from Officer McBride. He was certainly not in striking distance. How long would it have taken Hernandez, at his current walking pace, to reach McBride? The Motion provides no evidence and does not discuss the issue.

After McBride shot Hernandez twice in the abdomen, he was able to lift himself, with his hands and knee still on the ground. The Motion describes this, in a wild misdescription, as a "sprinter's position." A person who has been shot twice in the abdomen is not about to "sprint" anywhere.

After McBride shot Hernandez two more times, including a wound to his thigh, there is no evidence he could even walk. Hernandez fell to the ground and rolled to the side. That is it. He did not rise or attempt to rise. Yet, McBride shot him twice more, including a fatal "head shot" which traveled through the top of Hernandez's head. Such a shot was possible only if Hernandez was lying on the ground, with the top of his head facing McBride. He presented no threat.

The Motion refers to several cases involving knife-wielding citizens. In all of them, the suspect was far closer than 41 feet.

In *Estate of Toribio v. City of Santa Rosa*, 381 F.Supp.3d 1179 (N.D. Cal. 2019), the suspect was 8 to 10 feet from the officers.

Garcia scrambled from the bedroom still holding the knife. At the moment he emerged from the bedroom with the knife, Garcia was

> approximately *six to eight feet from Officer Vlahandreas and nine to*
>
> *ten feet from Officer Badger*. . .

*Id.* at p. 1186, emphasis added.

*Toribio* referred to "*City & Cty of San Francisco v. Sheehan*, 135 S.Ct. 1765, 1776-76 (2015) (after officers attempted to subdue mentally ill suspect with pepper spray and she continued to advance on them with a large knife until she was '*a few feet from*' one officer, '[n]othing in the Fourth Amendment barred [the officers] from protecting themselves. . ." *Id.* at 1189.

The Motion also relies on *Blanford v. Sacramento County*, 406 F.3d 1110, *supra*. Blanford was carrying a 2 ½ foot long sword. "The deputies followed Blanford *at a safe distance of 20 to 25 feet* as they were trained to do for persons with edged weapons. Their guns were drawn and aimed." Id. at 1112, emphasis added.

> Blanford then turned onto Gaines Avenue and began angling his
>
> walk toward 8679 Gaines . . Blanford walked up the lawn of 8679 to
>
> the front door, where he searched his pockets for his keys but realized
>
> he did not have them. He knocked on the door, but no one answered.
>
> Blanford then started walking down the walkway that led in front of
>
> the house, past the driveway and garage, and around to the side where
>
> there was a gate that led along-side the garage to the back yard. . . .

Neither deputy believed that Blandford should be allowed to get out of sight into the back of the house due to the danger he presented to anyone in the yard or the house. Both fired as Blanford rounded the corner of the house to the gate ("the first volley"). Blanford was hit by at least one shot. Nevertheless, he went through the gate, and it closed behind him. Anderson kicked the gate open and saw Blanford *about ten feet away* trying to open a door into the garage through which entrance could be gained into the residence. Anderson ordered him to drop the sword again. When Blanford did not drop the sword, or stop trying to push the door open, Anderson fired again, hitting Blanford in the right wrist ("the second volley"). He did so out of concern that Blanford would be able to get into the residence and cause death or injury to people inside. Blanford then turned away, still holding the sword, and walked toward the back yard. Anderson continued firing ("the third volley"). One of the bullets severed Blanford's spine, causing him to fall to the ground and rendering him a paraplegic.

Id. at 1113-1114, emphasis added. The deputies did not fire after Blanford fell to the ground.

This case is different from *Blanford*. The City does not identify any cases holding that it is reasonable to shoot a person holding a bladed weapon who is more than 40 feet away.

## 5. THE DISTRICT COURT ERRED IN CONCLUDING THAT THE NUMBER OF SHOTS FIRED IS IMMATERIAL

In their Motion for Summary Judgment, the City misconstrues applicable law regarding a claim that police officers fired more gunshots than were reasonable. The Motion erroneously argued, "[I]t is well-established that the number of gunshots is irrelevant to the analysis of objective reasonableness, so long as the use of deadly force was reasonable in the first instance. 4-ER-887:11-13. Not so.

To reach this preferred result, the City mangles the holding of *Plumhoff v. Ricard,* 572 U.S. 765, 77. *Plumhoff* states, "We now consider respondent's contention that, even if the use of deadly force was permissible, petitioners acted unreasonably in firing a total of 15 shots. We reject that argument. It stands to reason that, if police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting *until the threat has ended*." Emphasis added. The City ignores the phrase, "until the threat has ended."

*Plumhoff* is clearly established law.

The Supreme Court explained in the next paragraph, "Here, during the 10-second span when all the shots were fired, Rickard never abandoned his attempt to flee. Indeed, even after all the shots had been fired, he managed to drive away and to continue driving until he crashed. *This would be a different case if petitioners had initiated a second round of shots after an initial round had clearly incapacitated Rickard and had ended any threat of continued flight*, or if Rickard had clearly given himself up. But that is not what happened." *Id*. at 777, emphasis added.

Other than their mischaracterization of *Plumhoff*, appellees offer no justification for Officer McBride's decision to shoot Hernandez six times. The District Court accepted appellees' mischaracterization, stating:

> Plaintiffs' second argument is that the number of shots fired by Officer McBride – particularly the fifth and sixth rounds – was unreasonable because Decedent could no longer be considered an imminent threat after the initial two shots were fired. . . *As Defendants observe, the Supreme Court has rejected this argument, finding the overall number of shots fired is not the correct measure of reasonableness.*

1-ER-012:first full paragraph.

As a backup position, the District Court erroneously stated the video evidence

"plainly contradicted" a claim that "Decedent no longer posed a risk after the initial round was fired." 1-ER-012:first full paragraph. The Order describes the video evidence as follows. "After the first volley, Decedent, still holding the knife, quickly pops back up and appears positioned to charge at Officer McBride.[2] After the second volley, Decedent hits the ground, and still holding the knife, rolls over from his back and still *appears to try to get up*[3] – or, at least, it cannot be said that the threat had ended." 1-ER-012: first full paragraph.

The Order does not explain how a person who has been shot four times and is on the ground "trying to get up" and holds a box cutter presents a threat to an armed officer who is more than 40 feet away, with additional officers on site.

*Bah v. City of New York*, 319 F. Supp. 3d 698, 710-711 (S.D.N.Y. 2018) is especially pertinent, stating, "But neither is there a claim in the post-trial briefing that a reasonable officer at the time could have believed that it was lawful to *shoot a person, who was incapacitated, face-up on the ground*. . . The fact that the person may have engaged in some form of threatening conduct in the moments before the shooting would not justify shooting him after he ceased posing a

---

[2] The Order does not state Hernandez "charged" at McBride, only that he was "positioned to charge" at McBride.

[3] The Order states Hernandez "appears to try to get up." Hernandez was on the ground trying to get up, with no indication he would be able to stand, let alone move towards Officer McBride.

threat. . ." Emphasis added. See also, *Gardner v. N.J. State Police*, 2018 U.S. Dist. LEXIS 184419, *42 (N.J.D.C. 2018) ["But the inquiry is not on the number of shots fired; it is on whether force continues after the threat ends. . ."]; *Luna v. Mullenix*, 765 F.3d 531, 537-538 (5th Cir. 2014) [collecting cases] " 'When deadly force is used, it is clear that the *severity and immediacy of the threat of harm* to officers or others are paramount to the reasonableness analysis. . . *Scott*, 550 U.S. at 386 (noting that the use of deadly force was objectively reasonable when '[t]he car chase that respondent initiated in this case posed a 'to others'); *see also Garner*, 471 U.S. at 11 ('Where the suspect poses *no immediate threat* to the officer . . . the harm resulting from failing to apprehend him does not justify the use of deadly force to do so.' "; *Thompson v. Mercer*, 762 F.3d 433, 440 (5th Cir. 2014) (noting that 'The question is whether the officer had reason to believe, *at that moment*, that there was a threat of physical harm') . . .*Bazan ex rel. Bazan v. Hidalgo Cnty*., 246 F.3d 481, 493  (5th Cir. 2001) ('The excessive force inquiry is confined to whether the Trooper was in danger *at the moment of the threat* that resulted in the Trooper's shooting Bazan.'); *Vaughan v. Cox*, 343 F.3d 1323, 1330 (11th Cir. 2003) ('Genuine issues of material fact remain as to whether [the suspects'] flight presented an immediate threat of serious harm to [the police officer] or others at the time [the officer] fired the shot.' "]; *Tan Lam v. City of Los Banos*, 976 F.3d 1003-03 (9th Cir. 2020).

*See*, *AGG v. City of Hayward*, 2020 U.S. Dist. LEXIS 189516, *24-25, N.D. Cal. 2020) ["[P]laintiffs contend that even if the use of deadly force was permissible, it was unreasonable to shoot at Gonsalez twelve times 'without reassessing [the threat] between shots.' . . . Plaintiffs' expert Stutchman opined that '[a]ny threat perceived by the officers was no longer present after gunshot #3 or certainly by #4, and *[Gonsalez] was down laying on the ground in a fetal position at the time of the last two shots*.' . . . Whether or not Wooley actually saw that Gonsalez was incapacitated before he stopped shooting, a jury could find that it was unreasonable under the circumstances to not at least slow his rate of fire to check. [¶] [V]iewing the facts in the light most favorable to Plaintiffs, the court finds that a reasonable jury could conclude that the officers' use of deadly force was not objectively reasonable . . ."]

The Court is invited to review the videos and determine whether Hernandez presented an imminent threat to anyone when he attempted to stand after being shot twice, or while on the ground, having been shot four times.

The District Court's Order never states why, after Hernandez had been shot two times or four times, the "imminent" threat did not end, particularly with several officers present. All the cases cited above demonstrate it is clearly established law that an officer cannot shoot a person after the "imminent threat" has ended.

## 6. THE "REASONABLENESS" OF MCBRIDE'S ACTIONS IS DETERMINED BASED UPON THE EVENTS AS THEY UNFOLDED, VIEWING THE FACTS MOST FAVORABLY TO THE HERNANDEZ PLAINTIFFS

The nature and the quality of the intrusion on an individual's Fourth Amendment interests must be balanced against countervailing governmental interests. *United States v. Place*, 462 U.S. 696, 703 (1983). The court's inquiry is therefore whether the totality of the circumstances justified the particular type of seizure. *Garner*, 471 U.S. at 8-9, *supra*; *Graham*, 490 U.S. at 396, *supra.* Apprehension by use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment. *Garner*, 471 U.S. at 7, *supra.*

The reasonableness of a particular use of force is judged from the perspective of a reasonable police officer "on the scene." *Graham*, 490 U.S. at 396-397, *supra*. The relevant perspective is that of a reasonable officer "at the scene at the time the events unfolded." *Jean Baptiste v. Gutierrez*, 627 F.2d 816 (11th Cir. 2010).

"[A]n officer's use of that force is reasonable only if a reasonable officer in Defendants' position would have had probable cause to believe that there was a threat of serious physical harm to themselves or others." *Thomson v. Salt Lake County*, 584 F.3d at 1313, *supra* (quoting *Estate of Larsen v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008). Where the suspect "poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not

justify the use of deadly force to do so." *Craighead v. Lee*, 399 F.3d 954, 961 (8th Cir. 2005).

"[C]ourts must consider 'the totality of the facts and circumstances in the particular case'; otherwise, that a person was armed would always end the inquiry." *Glenn v. Washington County*, 673 F.3d at 872, *supra*. "'The district court mischaracterized our case law as establishing that 'when a suspect was armed with a deadly weapon . . . the officers' use of force [was reasonable] as a matter of law — even when the suspect 'had not committed a significant crime or threatened anyone' and no identifiable bystanders were present.' In each of the cases the district court cited . . . . we engaged in a context-specific analysis rather than resting our holding on the single fact that the suspect was armed." *Ibid.*

## 7. MCBRIDE'S ACTIONS WERE NOT OBJECTIVELY REASONABLE

McBride's decision to shoot Hernandez six times was not objectively reasonable.

With regard to the first two shots, Hernandez was some 41 to 44 feet away, well beyond striking distance. McBride does not discuss whether or not other police officers were present. Obviously, McBride's partner was nearby. In addition, three other police officers appear in the patrol car video (Exhibit 5) almost immediately after McBride shot Hernandez for the sixth time. The Motion

provides no evidence regarding their location. The Motion provides no evidence whether "less lethal" methods (such as a taser) were available.

McBride's first two shots both hit Hernandez in his lower abdomen, knocking him down. One can reasonably conclude, he could not have moved quickly after being shot twice. McBride shot Hernandez two more times as he pushed himself up with his hands and knees (which McBride misrepresents as a "sprinter's stance," suggesting Hernandez was capable of sprinting). It would have been a very, very slow sprint.

The third shot hit Hernandez in the right thigh. After that, Hernandez was not going to sprint towards anyone. The fourth shot struck Hernandez in the right shoulder, while his buttocks touched the ground.

After the fourth shot, Hernandez was on the ground, with his knees curled in a "crunch" position. He was shot in his upper back. The final shot struck the top of Hernandez's head (a "head shot"), while he was nearly prone.

Hernandez was not moving towards McBride when he was shot the third, fourth, fifth, or sixth time.

"[I]t is well-established that 'absent probable cause' for an officer to believe the suspect poses 'an immediate threat of death or serious bodily injury' to others, 'use of deadly force is not objectively reasonable.' . . . Where the record does not conclusively establish the lawfulness of an officer's use of force, summary

judgment on the basis of qualified immunity is inappropriate. . . " *Banks v.*

*Hawkins*, 999 F.3d 521, 525 (8th Cir. 2021), citations omitted. "When reviewing  a

motion for summary judgment concerning a law enforcement officer's use of

deadly force, the key issue is whether a reasonable jury would necessarily find that

the law enforcement officer reasonably perceived an immediate threat of death

or serious physical injury at the time he or she used deadly force. *Gonzalez v. City*

*of Anaheim*, 747 F.3d 789, 794 (9th Cir. 2014)." *Nino v. United States*, 334 F.

Supp. 3d 1108, 1115 (S.D. Cal. 2018).


## 8. THE CONSTITUTIONAL RIGHT IS CLEARLY ESTABLISHED

*Mendez v. Cnty. of L.A*., 815 F.3d 1178, 1186-1187 (9th Cir. 2016) summarizes

applicable law:

> Law enforcement officers are entitled to qualified immunity from
>
> damages unless they violate a constitutional right that "was clearly
>
> established at the time of the alleged misconduct." *Ford v. City of*
>
> *Yakima*, 706 F.3d 1188, 1192 (9th Cir. 2013) (citations omitted).
>
> This inquiry "must be undertaken in light of the specific context of
>
> the case, not as a broad general proposition." *Saucier v. Katz*, 533
>
> U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001). But
>
> "officials can still be on notice that their conduct violates

established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002). "[T]he salient question . . . is whether the state of the law" at the time of the events . . . gave the deputies "fair warning" that their conduct was unconstitutional. *Id*. In other words, an officer is entitled to qualified immunity unless existing case law "squarely governs the case here." *Mullenix v. Luna*, 136 S. Ct. 305, 309, 193 L. Ed. 2d 255 (2015) (per curiam).

"An officer's use of deadly force is permissible only if 'the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.' " *Scott v. Henrich*, 39 F.3d 912, 914 (9th Cir. 1994). "Law enforcement officials may not kill suspects who do not pose an immediate threat to their safety or to the safety of others simply because they are armed." *Harris v. Roderick*, 126 F.3d at 1204, *supra.* "[I]t is well-established that 'absent probable cause' for an officer to believe the suspect poses 'an immediate threat of death or serious bodily injury' to others, 'use of deadly force is not objectively reasonable.' " *Banks v. Hawkins*, 999 F.3d at 521, *supra.* "When police confront a suspect who poses an immediate threat, they may use deadly force against him." *Zion v. Cty. of Orange,* 874 F.3d at 1075, *supra.* "If a jury were to find that Higgins shot and/or stomped on Zion's head after Zion no

longer posed an immediate threat, Higgins would have been 'on notice that his conduct would be clearly unlawful.' *Saucier v. Katz*, 533 U.S. 194, 202, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001). Defendants therefore aren't entitled to qualified immunity." Id. at 1076.

See, *Clayton v. Walker v. City of Orem*, 451 F.3d 1139, 1144-1145 (10th Cir. 2006), in which the Court affirmed the district court's denial of a motion for summary judgment based on qualified immunity. "Peterson drew his .45 caliber firearm, told Orem dispatch he was exiting his vehicle, and shot David Walker twice from a distance of twenty-eight feet. Plaintiffs allege that Clayton then shot David Walker two more times with his .40 caliber weapon while David was lying on the ground, from a distance of approximately twenty to twenty-five feet." *Estrada v. City of Las Cruces*, 2010 U.S. Dist. LEXIS 165148, *20 D. N.M. 2010) ["Generally, a knife-wielding suspect over twenty-one feet away is not considered an imminent threat. . ."]; *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1261 n.1 (10th Cir. 2008) (noting officer training manual "instructs that knife-wielding persons within 21 feet pose an 'imminent threat' to officers based on the time in which the distance can be closed in an attack"); *Chavez v. Las Vegas Metro. Police Dep*t., 2014 U.S. Dist. LEXIS 13012, at *8 (D. Nev. 2014) (noting officer training manual counsels that once "individual[] with [an]

edged weapon[], such as [a] knife[] . . . gets within 21 feet, the individual poses a risk of death or serious physical injury").

Further, "A simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern." *Deorle v. Rutherford*, 272 F.3d at 1281, *supra.*

Additionally, when an officer violates a policy or training of his department, he is on notice that his conduct is unreasonable and is not entitled to qualified immunity. *Drummond v. City of Anaheim*, 343 F.3d 1052, 1062 (9th Cir. 2003). *See*, *Headwaters Forest Def. v. County of Humboldt,* 276 F.3d 1125, 1131 (9th Cir. 2002) [there is no qualified immunity where officers violated regional and statewide police protocol].

**[REDACTED]**

If there was ever an immediate threat of serious injury or threat, which the Hernandez Plaintiffs dispute, that threat ended with the second shot. Therefore, McBride's conduct was not reasonable.

## 9. MCBRIDE'S DECISION TO SHOOT HERNANDEZ SIX TIMES, WITHOUT ANY WARNING, WAS NOT REASONABLE

As Hernandez walked forward, at a distance of 41 to 44 feet, McBride, without warning that deadly force would be applied if he did not immediately drop the boxcutter, shot him six times.

The entirety of McBride's qualified immunity claim is that she reasonably believed Hernandez posed an immediate threat to nearby bystanders and to her. There is no evidence which justifies such a belief. The video evidence is contrary to McBride's self-serving declaration. The bystanders, certainly, did not perceive that Hernandez was a threat to them.

In assessing the degree of threat the suspect poses to officers, the Court considers factors that include, but are not limited to: "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect." *Thomson v. Salt Lake County*, 584 F.3d at 1314, *supra,* (quoting *Estate of Larsen v. Murr*, 511 F.3d at 1260, *supra*).

> [T]he mere fact that a suspect possesses a weapon does not
>
> justify deadly force. See, e.g., *Harris v. Roderick*, 126 F.3d 1189,
>
> 1202 (9th Cir. 1997) (holding, in the Ruby Ridge civil case, that the
>
> FBI's directive to kill any armed adult male was constitutionally

72

unreasonable even though a United States Marshal had already been

shot and killed by one of the males); *Curnow v. Ridgecrest Police*,

952 F.2d 321, 324-25 (9th Cir. 1991) (holding that deadly force was

unreasonable where the suspect possessed a gun but was not

pointing it at the officers and was not facing the officers when they

shot); *Ting v. United States*, 927 F.2d 1504, 1508-11 (9th

Cir. 1991) (holding that deadly force was unreasonable where a

suspect had dropped his gun).

*Haugen v. Brosseau*, 351 F.3d 372, 381-382 (9th Cir. 2003).

"A simple statement by an officer that he fears for his safety or the safety of

others is not enough; there must be objective factors to justify such a concern."

*Deorle v. Rutherford*, 272 F.3d at 1281, *supra*.

Numerous appellate courts have pointed to the officer's failure to warn before

using deadly force as a significant factor in assessing the reasonableness of the

officer's conduct. *See*, e.g. *Hayes v. County of San Diego*, 736 F.3d at 1234, *supra,*

["[I] is significant that Hayes was given no warning before the deputies shot

him."]; *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1092 (9th Cir. 2013) ["[A]s

we have recognized before, the absence of a warning of the imminent use of force,

when giving such a warning is plausible, weighs in favor of finding a constitutional

violation. . ."]; *Glenn v. Washington County*, 673 F.3d at 876, *supra* ["We also

consider whether officers gave a warning before employing the force."]; *Deorle v. Rutherford*, 272 F.3d at 1283-84, *supra*) ["The absence of a warning or an order to halt is also a factor that influences our decision. Shooting a person who is making a disturbance because he walks in the direction of an officer at a steady gait with a can or bottle in his hand is clearly not objectively reasonable. Certainly, it is not objectively reasonable to do so when the officer neither orders the individual to stop nor to drop the can or bottle, and does not even warn him that he will be fired upon if he fails to halt. Appropriate warnings comport with actual police practice. Our cases demonstrate that officers provide warnings, where feasible, even when the force used is less than deadly. . . . [W]e simply determine that such warnings should be given, when feasible, if the use of force may result in serious injury, and that the giving of a warning or the failure to do so is a factor to be considered in applying the *Graham* balancing test."]; *Harris v. Roderick*, 126 F.3d at 1204, *supra* ["When Horiuchi shot Harris, without any warning, as he was retreating toward an area of safety, he acted in a patently unreasonable manner that violated clearly established law."]; *Calderin v. Miami-Dade Police Dep't*, 600 Fed. Appx. 691, 694 (11th Cir. 2015) ["Officer Schottenheimer resorted to lethal force to disarm Calderin without giving Calderin any warning."]; *Ludwig v. Anderson*, 54 F.3d 465, 474 (8th Cir. 1995) ["*Garner* requires the officer to give a warning 'where feasible.' 471 U.S. at 11-12. Viewing the facts most favorably to Merilyn Ludwig,

neither Anderson nor Strong gave Ludwig any warning immediately before shooting him. The absence of a final warning does not automatically 'render [an officer's] use of deadly force constitutionally unreasonable.' *Krueger*, 991 F.2d at 440. However, when combined, as here, with a potentially unconstitutional application of deadly force, the failure of both Strong and Anderson to warn Ludwig serves only to exacerbate the circumstances."].

Here, although McBride ordered Hernandez to drop the box cutter, she gave no warning before shooting him six times.

## 10. THE HERNANDEZ PLAINTIFFS' FOURTEENTH AMENDMENT CLAIM HAS MERIT. THE THIRD THROUGH SIXTH SHOTS FIRED "SHOCK THE CONSCIENCE"

The Hernandez Plaintiffs agree that due process violations under the Fourteenth Amendment occur only when official conduct "shocks the conscience." *Gantt v. City of Los Angeles*, 717 F.3d at 707, *supra.* By December 2013, it was clearly established Federal law that "a police officer who act[s] with the purpose to harm a civilian, unrelated to the legitimate law enforcement objectives of arrest, self-defense, or the defense of others, violate[s] the Fourteenth Amendment due process clause." *A. D. v. State of Cal. Highway Patrol*, 712 F.3d 446 (9th Cir. 2013). "Since 1998, clear precedent has established that a police officer violates the Fourteenth Amendment due process clause if he kills a suspect when acting with the purpose

to harm, unrelated to a legitimate law enforcement objective." Ibid.

It is possible the Court will conclude Officer McBride's decision to fire the first and second shots does not shock the conscience. Hernandez does not agree. Further, the third through sixth shots are different. The first two shots resulted in abdominal wounds. While Hernandez after being knocked down, attempted to stand. He did no more than attempt before he was shot two more times. There is no evidence Hernandez was physically able to advance further towards Officer McBride.

The fifth and sixth shots were, to be blunt, a public execution. Hernandez was on the ground when he was in the back and top of his head (last shot). He had been shot four times already. He rolled to his side, but nothing more. There is no evidence Hernandez was physically able to stand up. He could have been shot in the *top* of his head only if he was lying on the ground.

"While Defendants' Motion focuses on why the pain suffered by inmates is not constitutionally problematic, it ignores that executing someone who is physically paralyzed and mentally incapacitated shocks the conscience and is violative of fundamental human dignity, and thus, the Eighth Amendment." *In re Ohio Execution Protocol Litig.*, 2020 U.S. Dist. LEXIS 219570, *26 (Oh. S.D. 2020).

## 11. THE LOS ANGELES POLICE DEPARTMENT IS A SEPARATELY SUABLE ENTITY

LAPD is a separately suable entity. See, *Streit v. County of Los Angeles*, 236 F.3d at 565, *supra* [police and sheriff departments in California, specifically the Los Angeles Sheriff's Department, are "separately suable entit[ies]" and can be subject to liability under Section 1983); *Hupp v. San Diego County*, 2012 U.S. Dist. LEXIS 97664, *8 (S.D. Cal. 2012).

## 12. THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT ON THE STATE LAW CLAIMS SINCE MCBRIDE'S ACTS WERE NOT REASONABLE. FURTHER, THE DISTRICT COURT DID NOT CONSIDER THAT REASONABLENESS UNDER SECTION 1983 IS NOT DETERMINATIVE OF REASONABLENESS UNDER STATE LAW

The City's argument is that the Hernandez Plaintiffs have no merit because claims for assault and battery, wrongful death, and violations of California Civil Code sections 51.7 "are all based on the premise that Officer McBride's actions were negligent and unlawful." 4-ER-898:7-8. See also, 4-ER-898:27-28 ["In such cases, a plaintiff must prove that the peace officer's use of force was unreasonable."]; 4-ER-899:3-4 ["A battery claim is a state law counterpart to a federal 42 U.S.C. section 1983 claim of excessive use of force because, in both, a plaintiff must prove that the peace officer's use of force was unreasonable."]. See, 4-ER-899:10-13.

The Order states, "Because the Court has determined that Officer McBride's use of force was reasonable, Defendants are also entitled to summary judgment on Plaintiffs' remaining state-law claims." 1-ER-020: first full paragraph.

In making its determination, the District Court erred in not considering California law with regard to appellants' State Law claims. Reasonableness with regard to constitutional violations is not the same as reasonableness for State Law claims. *Rodriguez v. City of Fresno* (E.D. Cal. 2011) 819 F. Supp. 2d 937, 952.

"The parties agree that a police officer has the obligation 'to use reasonable care in deciding to use and in fact using deadly force.' . . . In addition, there is agreement that a claim of negligence in connection with the application of force by police personnel requires a showing of (1) a legal duty to use reasonable care, (2) a breach of that duty (3) proximate causation, and (4) injury to the plaintiff." Id. at 951, citations omitted.

> . . . An officer's actions may be unreasonable, negligent or in violation of departmental policy without necessarily rising to the level of constitutional abridgment under the Fourteenth Amendment. Crediting Plaintiff's evidence as it must, the court finds Plaintiff has presented evidence to support facts that, if proven, would show police officer conduct that can be held negligent. Summary judgment as to Plaintiff's third claim for relief is therefore not appropriate.

Id. at 952, citations omitted.

> Although the court can find no evidence that affirmatively
> indicates Chavez targeted Plaintiff in order to shoot Hernandez, the
> court may not find for Defendants on Plaintiff's battery claim because
> the court cannot rule out the possibility that a jury could find that
> Chavez unreasonably used lethal force against Hernandez. Summary
> judgment as to Plaintiff's claim for battery is therefore not warranted.

819 F. Supp. 2d at 953

McBride's acts were not reasonable. The unreasonableness of her acts is especially profound with regard to the third through sixth shots she fired. Therefore, the District Court erred in dismissing the Hernandez Plaintiffs' claims for assault and battery and wrongful death.


## 13. CONCLUSION

The District Court's grant of the City's Motion for Summary Judgment should be reversed, and this matter should be remanded to the District Court for trial.

Dated: March 17, 2022

Respectfully Submitted,

By: /s Gerald P. Peters
     Gerald Peters
Attorney for Appellants
Estate of Daniel Hernandez, Manuel Hernandez
and Maria Hernandez

**STATEMENT OF RELATED CASES**

To the knowledge of appellants, there are no related cases to the case at bar.

Dated: March 17, 2022

Respectfully Submitted,

By: /s Gerald P. Peters
    Gerald Peters
Attorney for Appellants
Estate of Daniel Hernandez, Manuel Hernandez
and Maria Hernandez

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements


1.  This brief complies with the type-volume limitation of Fed. R. App. P.
32(a)(7)(B) because:

This brief contains 13,986 words, excluding the parts of the brief exempted by
Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P.
32(a)(5) because:

This brief has been prepared in proportionally spaced typeface using Word 365,
size 14 font, Times New Roman.



Signature:  /s Gerald P. Peters
Attorney for: Appellant Estate of Daniel Hernandez, by and through Successors in
Interest, Manuel Hernandez, Maria Hernandez and M.L.H, Manuel Hernandez and
Maria Hernandez


Date: March 17, 2022

9th Circuit Case Number: 21-55994

## CERTIFICATE OF SERVICE

 I hereby certify that I electronically filed Appellants' Opening Brief and Excerpts of Record (6 volumes) with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on February 25, 2022.

 I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


Signature:    /s Gerald P. Peters