No. 21-55994

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**
_____

ESTATE OF DANIEL HERNANDEZ, etc., et al,

Plaintiffs/Appellees,

v.

CITY OF LOS ANGELES, et al.,

Defendants/Respondents.

_____

On Appeal from an Order of the United States District Court
For the Central District of California
Honorable Judge Stanley Blumenfeld, Jr.
Case No. 2:20-cv-04477-SB (KSx)

_____

**BRIEF RE REHEARING EN BANC OF APPELLANTS ESTATE OF
DANIEL HERNANDEZ,  BY AND THROUGH SUCCESSORS IN
INTEREST, MANUEL HERNANDEZ, MARIA HERNANDEZ AND M.L.H,
MANUEL HERNANDEZ AND MARIA HERNANDEZ**

_____

Gerald P. Peters, Esq.                  Arnoldo Casillas, Esq.
Law Office of Gerald Philip Peters      Casillas & Associates
P.O. Box 6759                           3777 Long Beach Blvd., 3rd Floor
Thousand Oaks, CA 91359                 Long Beach, CA 90807
(818) 706-1278                          (562) 203-3030

Attorney for Appellants Estate of Daniel Hernandez, Manuel Hernandez and Maria
Hernandez

# TABLE OF CONTENTS

| | Page |
|---|---|
| 1. INTRODUCTION | 5 |
| 2. CONTINUING INTEREST IN JUDGE WILLET'S OPINION REGARDING THE SCRIVENER'S ERROR REMOVING THE SO-CALLED "NOTWITHSTANDING CLAUSE" FROM THE TEXT OF SECTION 1983 | 7 |
| 3. AN EN BAN REHEARING IS REQUIRED TO ADDRESS THE DOWNWARD ARC IN SECTION 1983 JURISPRUDENCE | 9 |
| A. *ZION V. CITY OF ORANGE* | 10 |
| B. *LOPEZ V. GELHAUS* | 12 |
| C. *HERNANDEZ V CITY OF LOS ANGELES* | 16 |
| 4. CONCLUSION | 23 |

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Abshire v. Livingston Par.*,
    2023 U.S. Dist. LEXIS 88797 (M.D. La. 2023)..................................................9

*Bernal v. Sacramento Cnty. Sheriff's Dep't*,
    73 F.4th 678 (9th Cir. 2023.) ..........................................................................22

*Bryan v. Macpherson*,
    630 F.3d 805 (9th Cir. 2010) .............................................................................9

*Currow v. Ridgecrest Police*,
    952 F.2d 321 (9th Cir. 1991) ...........................................................................15

*Davis v. City of Las Vegas*,
    478 F.3d 1048 (9th Cir. 2007) ...........................................................................9

*Dilley v. Louisiana*,
    2023 U.S. Dist. LEXIS 211678 (M.D. La 2023)..................................................9

*Erie v. Hunter*,
    675 F. Supp. 3d 647 (M.D. La. 2023)..................................................................9

*Est. of Parker v. Miss. Dept of Pub. Safety*,
    2024 U.S. Dist. LEXIS 57615 (S.D. Miss. 2024)................................................8

*George v. Morris*
    736 F.3d 829 (9th Cir. 2013) ...........................................................................15

*Harris v. Roderick*,
    126 F.3d 1189 (9th Cir. 1997) .........................................................................15

*Hernandez v. City of Los Angeles*
    96 F.4th 1209, 21-55994 (2024) ................................................................ 16-22

*Hyde v. City of Wilcox*,
   23 F.4th 863 (9th Cir. 2020) ...............................................................10

*Kisela v. Hughes*,
   584 U.S. 100, 138 S. Ct. 1148, 200 L. Ed. 2d 449 (2018) ................................20

*Lopez v. Gelhaus*,
   871 F.3d 998 (9th Cir. 2017) ..................................................... 12-15

*Miller v. LeBlanc*,
   2023 U.S. Dist. LEXIS 173898 (M.D. La 2023)................................8

*Plumhoff v. Rickard*,
   525 U.S. 765 (2014) ...........................................................17

*Price v. Montgomery Cnty.*,
   72 F.4th 711 (6th Cir. 2023) ...............................................7

*Rogers v. Jarrett*,
   63 F.4th 971 (5th Cir. 2023) .........................................5, 7

*Smith v. City of Hemet*,
   394 F.3d 689 (9th Cir. 2005) (en banc) ...........................9

*Zion v. County of Orange*,
   874 F.3d 1072 (1997) ........................................ 10, 11, 12, 17, 20, 21

**Federal Statutes**

Civil Rights Act of 1871 (Section 1893) ...........................................5, 7, 9

# 1. INTRODUCTION

Per the Court's April 18, 2024 Order, appellants Estate of Daniel Hernandez, Manuel Hernandez and Maria Hernandez present their opinion as to whether there should be a rehearing en banc.

Counsel is conscious of the potential conflict presented since appellants' interests require consideration of the potential benefit of remand to the Superior Court. Nevertheless, appellants request a rehearing en banc because of the readily noticeable downward arc of section 1983 proceedings for plaintiffs. There has been a severe and unmistakable degradation in the Court's jurisprudence adverse to plaintiffs in recent years from expansive application of the doctrine of qualified immunity. Qualified immunity has swallowed section 1983 actions whole.

Appellants request a rehearing both for the purpose of reaching a just and proper result under existing precedent and, also, to return to section 1983's original meaning. Specifically, recent scholarship revealed a key provision prohibiting application of state immunities to section 1983 claims was erroneously omitted from the 1874 compilation of Federal law.

The latter issue was first raised by Judge Willet in his concurring opinion in *Rogers v. Jarrett*, 63 F.4th 971 (5th Cir. 2023), published four weeks after oral argument in *Hernandez*.

Judge Willet states:

For more than half a century, the Supreme Court has claimed that (1) certain common-law immunities existed when § 1983 was enacted in 1871, and (2) "no evidence" suggests that Congress meant to abrogate those immunities rather than incorporate them. But, what if there were such evidence? Indeed, what if the Reconstruction Congress had explicitly stated – right there in the original statutory text – that it was nullifying all common-law defenses against § 1983 actions? That is, what if Congress's literal language unequivocally negated the original interpretive premise for qualified immunity? Professor Alexander Reinert argues precisely this in his new article, *Qualified Immunity's Flawed Foundation* – that courts have been construing the wrong version of § 1983 its entire legal life.

As passed by the Reconstruction Congress, Section 1 of the Civil Rights Act of 1871 (now colloquially known as § 1983) read this way:

> [A]ny person who, under color of any law, statute, ordinance, regulation, custom, or usage of any State, shall subject, or cause to be subjected, any person within the jurisdiction of the United States to the deprivation of any rights, privileges, or immunities secured by the

Constitution of the United States, shall, *any such law,*

*statute, ordinance, regulation, custom, or usage to the*

*contrary notwithstanding*, be liable to the party in any

action at law, suit in equity or other proper proceeding for

redress. . .

63 F.4th 971 at 970, emphasis added.

Counsel, upon learning of the *Rogers* decision, immediately advised the

Court in a letter dated and e-filed on July 29, 2023. A copy is attached.

The *Hernandez* decision was not filed until March 2024.

In *Rogers*, a petition for certiorari was timely filed in July 2023, but

denied in October 2023.

## 2. CONTINUING INTEREST IN JUDGE WILLET'S OPINION REGARDING THE SCRIVENER'S ERROR REMOVING THE SO-CALLED "NOTWITHSTANDING CLAUSE" FROM THE TEXT OF SECTION 1983

Since *Rogers* was decided, Judge Willet's concurrence has been discussed by

the 6th Circuit of Appeals and several District Courts in Texas, Mississippi,

Louisiana and Florida, with some Judges overtly expressing their inability to do

anything given binding Supreme Court precedent. *See*, *Price v. Montgomery Cnty*.,

72 F.4th 711, 727, fn. 1 (6th Cir. 2023) ["Some have argued that the justification

for granting immunity in § 1983 actions— 'that Congress wouldn't have abrogated

common-law immunities absent explicit language'—is 'faulty because the 1871 Civil Rights Act *expressly included such language.*' *Rogers v. Jarrett*, 63 F.4th 971, 980 (5th Cir. 2023) (Willett, J., concurring) ["Emerging scholarship suggests that the express abrogation of common-law immunities only dropped out of the statute when '[f]or reasons lost to history, [the language] was inexplicably omitted from the first compilation of federal law in 1874.' . . . [A]ccording to this recent scholarship, because the Civil Rights Act of 1871 explicitly abrogated the common-law immunities grounded in state law, those immunities are abrogated now *sub silentio* under the current version of § 1983."]

See, *Est. of Parker v. Miss. Dept of Pub. Safety*, 2024 U.S. Dist. LEXIS 57615, *18, n. 8 (S.D. Miss. 2024) ["If a Fifth Circuit panel cannot 'definitively grapple' with Section 1983's text in a way that runs contrary to Circuit or Supreme Court precedent, this Court certainly cannot."]; *Miller v. LeBlanc*, 2023 U.S. Dist. LEXIS 173898, *11, n. 8 (M.D. La 2023) ["The qualified immunity defense remains 'the law of the land.' . . . But for how long? Recent scholarship shows that the doctrine is founded on a legal fiction derived from a reconstruction-era scrivener's error that removed a determinative 16-word clause from the published version of 42 U.S.C. § 1983. . At least one jurist of the U.S. Court of Appeals for the Fifth Circuit has determined that this clause, if restored to its proper place, "unequivocally negate[s] the original interpretive premise for qualified immunity"

. . . [T]he undersigned joins the call for the Supreme Court to 'definitively grapple with § 1983's enacted text and decide whether it means what it says—and what, if anything, that means for § 1983 immunity."]; *Abshire v. Livingston Par.*, 2023 U.S. Dist. LEXIS 88797, *26 (M.D. La. 2023) ["[T]his Court's own feelings toward qualified immunity are ultimately irrelevant; Plaintiffs' arguments are best left for the Supreme Court or the Fifth Circuit sitting en banc, not for a district court."]; *Erie v. Hunter*, 675 F. Supp. 3d 647, 652 (M.D. La. 2023) ["Recent groundbreaking scholarship from Professor Alexander A. Reinert . . . shakes the very foundation of the qualified immunity doctrine."]; *Dilley v. Louisiana*, 2023 U.S. Dist. LEXIS 211678, *8, n. 3 (M.D. La 2023).

Appellants are aware this Court is bound by Supreme Court precedent. However, an en banc decision from the nation's largest circuit (9 states and 2 territories) would be significant. An en banc decision questioning the continuing viability of qualified immunity as applied to section 1983 would send a powerful message that Supreme Court review is necessary.

### 3. AN EN BAN REHEARING IS REQUIRED TO ADDRESS THE DOWNWARD ARC IN SECTION 1983 JURISPRUDENCE

The most important use of force factor is whether the suspect posed an "immediate threat" to the officer or others. *Smith v. City of Hemet*, 394 F.3d 689,

702 (9th Cir. 2005) (en banc). The objective facts must indicate that the suspect pose[d] an immediate threat. *Bryan v. Macpherson*, 630 F.3d 805, 826 (9th Cir. 2010). "This analysis is not static, and the reasonableness of force may change as the circumstances evolve." *Hyde v. City of Wilcox*, 23 F.4th 863, 870 (9th Cir. 2020).

## A. *ZION V CITY OF ORANGE*

Appellants begin with a discussion of *Zion v. City v. Orange*, 874 F.3d 1072 (2017), the most similar 9th Circuit decision.

Zion suffered several seizures. He cut his mother and his roommate with a kitchen knife. When Deputy Lopez arrived, Zion stabbed him in his arms. Then, Zion ran.

Deputy Higgins shot nine times from about fifteen feet away and Zion fell to the ground. From about four feet away, Higgins shot Zion nine more times. Higgins then took a running start and stomped on Zion's head three times. Zion died at the scene.

The District Court granted summary judgment in favor of defendants on all claims.

The Ninth Circuit reversed, noting at, in determining whether Deputy Higgins' use of force was objectively unreasonable under the circumstances, "[t]he most important factor is whether the suspect posed an immediate threat." *Id.* at p. 1075.

Plaintiff challenged only the second volley of 9 shots and the head-stomping. At that point, Zion appeared to be alive, but not threatening. "In the video, Zion appears to have been wounded and is making no threatening gestures. . . While Higgins couldn't be sure that Zion wasn't bluffing or only temporarily subdued, Zion *was* lying on the ground and so was not in a position where he could easily harm anyone or flee. A reasonable jury could find that Zion was no longer an immediate threat, and that Higgins should have held his fire unless and until Zion showed signs of danger or flight." *Id.* at pp. 1075-1076, emphasis in original.

Defendants argued that "Higgins' continued use of deadly force was reasonable because Zion was still moving." *Id.* at p. 176. *Zion* rejected that argument:

> [T]erminating a threat doesn't necessarily mean terminating the suspect. If the suspect is on the ground and appears wounded, he may no longer pose a threat; a reasonable officer would reassess the situation rather than continue shooting. *This is particularly true when the suspect wields a knife rather than a firearm.* . . [A] jury could reasonably conclude that Higgins could have sufficiently protected himself and others after Zion fell by pointing his gun at Zion and pulling the trigger only if Zion attempted to flee or attack.

*Id.* at p. 1076, emphasis added. The last sentence is equally applicable to *Hernandez.*

Further, "Higgins testified that Zion was trying to get up. But 'we may not simply accept what may be a self-serving account by the police officer' . . . This is especially so where there is contrary evidence. In the video, Zion shows no signs of getting up. . . This is a dispute of fact that must be resolved by a jury." *Ibid.* Again, the language is equally applicable to *Hernandez.*

*Zion* concluded, "The Fourth Amendment right here was 'clearly established' . . . If a jury determines that Zion no longer posed an immediate threat, any deadly force Higgins used after that time violated long-settled Fourth Amendment law." *Ibid.* Citing *Drummond v. City of Pasadena*, 343 F.3d 1052 (9th Cir. 2003) and *Davis v. City of Las Vegas*, 478 F.3d 1048 (9th Cir. 2007), *Zion* commented, "We've also held that continued force against a suspect who has been brought to the ground can violate the Fourth Amendment." *Ibid. Zion* concluded, "If a jury were to find that Higgins shot and/or stomped on Zion's head after Zion no longer posed an immediate threat, Higgins would have been 'on notice' that his conduct would be clearly unlawful," citing *Saucier v. Katz*, 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed. 272 (2001). *Ibid*. Again, the language is equally applicable to *Hernandez.*

## B. LOPEZ V. GELHAUS

*Lopez v. Gelhaus*, 871 F.3d 998 (9th Cir. 2017) demonstrates proper analysis of a motion for summary judgment concerning a qualified immunity defense. In

*Lopez*, both the District Court and the Court of Appeals properly interpreted disputed or ambiguous facts in Lopez's favor. Counsel was the attorney for appellants in *Lopez*.

In *Lopez*, the District Court denied Officer Gelhaus and Sonoma County's Motion for Summary Judgment, finding the deputy's conduct was not reasonable and the constitutional right was clearly established.

Officer Gelhaus shot and killed 13 year old Andy Lopez, who was holding a toy replica AK-47 while peacefully walking. Officers Schemmel and Gelhaus saw Lopez walking with the toy rifle. Schemmel parked the patrol car. Gelhaus exited the vehicle first.

Gelhaus aimed his pistol at Andy and yelled loudly at least one time, "Drop the gun!" Andy had been walking  this whole time, so he was about sixty-five feet from the officers when Gelhaus shouted. Andy did not drop the gun; he paused a few seconds and began to rotate his body clockwise. Gelhaus then "saw the gun come around" as Andy's torso turned. The parties dispute what happened next.

According to Gelhaus's declaration, "[w]ith the weapon still in [Andy's] left hand swinging around and toward [the officers], and with the barrel of the weapon coming up," Gelhaus fired eight shots in rapid succession, seven of which hit Andy. In his videotaped

13

deposition, however, Gelhaus stated that Andy "didn't turn towards me when I shot him." Gelhaus shot Andy in the chest, so Andy was facing the officers when Gelhaus opened fire. Gelhaus concedes that he does not know where Andy was pointing the rifle at the time that he was shot. Nor does Gelhaus know if Andy's gun was ever actually pointed at him.

871 F.3d at pp. 1002-1003.

Initially, *Lopez* notes, "We have held that 'summary judgment should be granted sparingly in excessive force cases.' *Gonzalez v. City of Anaheim*, 747 F.3d 789, 795 (9th Cir. 2014) (en banc)." *Id.* at 1006.

The Court of Appeal noted there were four factual issues to be resolved in the manner most favorable to Lopez. First, the Court assumed Lopez did not look over his shoulder in response to the patrol car's "chirp" and, therefore, he did not know police officers were behind him until Gelhaus yelled, "drop the gun." Second, in light of competing evidence, the Court assumed Gelhaus only yelled once. Third, in light of competing evidence whether Lopez held the toy rifle in his left hand or his right hand, the Court interpreted the evidence in a manner most favorable to Lopez's position, which was relevant as to what Gelhaus saw as Lopez turned towards him. Fourth, competing evidence regarding movement of the toy rifle as Lopez turned towards Gelhaus was interpreted to demonstrate the toy rifle was not

raised to a level that it presented an apparent threat to Gelhaus. *Id.* at pp. 1006-8.

*Lopez* notes, "[W]here there is no surviving witness, 'we carefully examine all the evidence in the record . . . to determine whether the officer's story is internally consistent and consistent with other known facts.' . . . Bearing that in mind, the present record furnishes abundant grounds for a jury to reasonably question Deputy Gelhaus's credibility and accuracy. . ." 871 F.3d 998, 1008-1009, citation omitted.

*Lopez* affirmed the District Court's denial of summary judgment. "The record supports the district court's conclusion, and certainly would not compel a jury to conclude to the contrary. . . [W]e must accept the district court's factual finding that the position of Andy's gun barrel never posed any threat to Gelhaus or Schemmel as Andy turned. *See Tolan v. Cotton*, 134 S. Ct. 1861, 1866, 188 L. Ed. 2d 895 (2014) (per curiam) ('[C]ourts may not resolve genuine disputes of fact in favor of the party seeking summary judgment.')." *Id* at pp. 1009-1010.

*Lopez* held the violation of Lopez's constitutional rights was "clearly established." at the time of Gelhaus's conduct. *Id.* at 1005. On appeal, the Court stated *George v. Morris* 736 F.3d 829 (9th Cir. 2013) served that function, with *Harris* v. *Roderick*, 126 F.3d 1189 (9th Cir. 1997) and *Currow v. Ridgecrest Police*, 952 F.2d 321, 324-325 (9th Cir. 1991) also providing Gelhaus with guidance. *Id.* at 1018.

In *George v. Morris*, Donald George, a 64 year old man with terminal brain

cancer, awoke in the middle of the night. Since he was on chemotherapy he needed to eat frequently. Donald retrieved his gun, and loaded it with ammunition.

His wife, Carol, called 9-1-1. Deputies were dispatched for a domestic disturbance involving a firearm. Carol met them at the front door and told them not to scare Donald. The deputies saw Donald open the door to the balcony. They identified themselves and instructed him to show his hands. Donald was using a walker, holding a gun with the barrel pointing down. A deputy testified that Donald raised the gun and pointed it at him, prompting the deputy to fire. However, there was reliable evidence to support a contrary version. Therefore, the Court did not credit the deputy's testimony. The Court concluded Donald did not take any objectively threatening actions. The Court concluded the deputy shot George without objective provocation.

## C. *HERNANDEZ V. CITY OF LOS ANGELES*

The downward arc of section 1983 qualified immunity analysis is well illustrated by the difference between the analysis and result in *Zion* and *Lopez*, both decided in 2017, versus the analysis and result in *Hernandez*, argued in March 2023 and decided in March 2024. Parenthetically, the majority opinion in *Lopez* was written by Judge M. Smith, who was also on the *Hernandez* panel.

In *Hernandez*, the District Court did not interpret competing or ambiguous evidence in favor of the opposing party. Rather, the District Court concluded that because officer McBride stated she perceived a continuing threat, even after she shot Hernandez four times, it could rely on her self-serving conclusion.

The Court of Appeal disagreed, finding that a jury could determine the McBride's final two shots were unreasonable. But the Court concluded Hernandez's constitutional right was not clearly established.

*Hernandez* quotes *Plumhoff v. Rickard*, 525 U.S. 765 (2014) for the rule that "police officers are justified in firing at a suspect in order to end a severe threat until the threat has ended" (Opn, page 13), which, conversely, means that if the threat has ended, police officers are not "justified in firing at a suspect." The rule has been clearly established since at least 2014 and was sufficient to place Officer McBride not to shoot Hernandez since the threat had ended.

*Hernandez* also quotes *Zion* for the rule that "terminating a threat doesn't necessarily mean terminating a suspect." Opn, page 13. Then, *Hernandez* quotes *Zion* a second time. "[I]f an initial volley of shots has succeeded in disabling the suspect and placing him 'in a position where he could not easily harm anyone else or flee' a 'reasonable officer would reassess the situation rather than continue shooting." Opn, page 13. Seems like a simple, understandable rule.

The *Hernandez* opinion states the following facts, presumably from reviewing

McBride's bodycam video and the police car video, which demonstrate Hernandez, after being shot 4 times, was incapacitated and presented no threat:

> As Hernandez started shifting his weight to his feet to stand up [after being shot twice], McBride again yelled "Drop it!" and fired a second volley of two shots causing Hernandez to fall on his back with his legs bent in the air, pointing away from McBride. ***Hernandez began to roll over onto his left side***, *and as he did this, McBride fired a fifth shot. Hernandez then continued to roll over, so that he was again facing McBride. His bent left knee was pressed against the ground and he placed his left elbow on the street* ***as if to push himself upwards***. *But* ***Hernandez started to collapse to the ground***, *and just as he did so, McBride fired a sixth shot.*

Opinion, page 8, emphasis added. Hernandez, having been shot 4 times, "began to roll over," and was shot a fifth time. He did not present a threat. He was on the ground.

Hernandez pressed his left knee against the ground and placed his left elbow on the street "as if to push himself upwards," but "started to collapse" as he was shot a sixth time. Hernandez never rose. He positioned his left knee and elbow "as if to push himself upwards," but immediately collapsed.

Hernandez who was holding a box cutter, did not present a threat. He was not able to stand.

On page 14, the Opinion returns to these events.

> He was . . . facing away from McBride and *still lying on his side on the ground* when McBride fired her fifth shot. . . *[He] had not shown that he was in any position to get back up.* Hernandez continued to roll over, so that he was again facing McBride. As Hernandez, *while still down on the ground,* first appeared to shift his weight onto his left elbow, McBride fired her sixth shot.

(Emphasis added.) When McBride fired the sixth shot, Hernandez "had not shown that he was in any position to get back up."

The *Hernandez* Court correctly concluded the reasonableness of McBride's conduct presented a question of fact for the jury. Page 15.

It seems clear that the established rule is that, when the suspect is in a position where he could not easily harm anyone else or flee, the justification for use of deadly force ends.

Nevertheless, *Hernandez* believes it is an "overbroad reading" of *Zion*, contrary to *Kinsela* 584 U.S. 100, 138 S. Ct. 1148, 200 L. Ed. 2d 449 (2018), to hold that it establishes a "broader position that 'the use of deadly force

against a non-threatening suspect is unreasonable.' " Opn. at 19. *Hernandez*

ignores *Plumhoff.*

Then, the Opinion states, "Given that *Zion* itself noted that the relevant

line is 'murky' it can hardly be said to have *clearly* established a general rule

that places the outcome of this case beyond debate." *Ibid.* Under *Hernandez*,

because *Zion* states the "relevant line" is "murky," it can never represent

established law.

If this case isn't close enough to *Zion's* facts for *Zion* to be controlling,

what facts would be? Would 8 shots, plus 8 shots, be sufficient? Or is there

some sort of magic in 9 shots, plus 9 shots?

*Hernandez* quotes *Kisela,* that plaintiff has to show "any reasonable

official in the defendant's shoes would have understood that he was

violating" the Constitution. Opn. at 20. *Hernandez* does not explain why the

well-established rule that use of deadly force must cease when the threat

ceases is not sufficiently clear to a reasonable police officer? *Hernandez*

ruled that a jury could conclude that McBride acted unreasonably in firing

the fifth and six shots. But, *Hernandez* also holds that the rule that the rule

that use of deadly force must cease when the threat ceases is not sufficiently

clear to a reasonable police officer. This makes no sense.

To deal with this obvious problem, *Hernandez* disingenuously claims that

the *Zion* decision "differs in several critical respects from the instant case and that it therefore cannot be said to have clearly established the law that governs here." Opinion, page 17. *Hernandez* does not demonstrate these differences. Of course, *Hernandez* already decided McBride's decision to keep shooting was unreasonable.

First, *Hernandez* Court conflates *Zion's* precedent-only discussion of whether the right is clearly established with its fact-based discussion of the reasonableness of Officer Higgins' conduct. *Zion's* short discussion of when a right is "clearly established," at 874 F.3d. 1076, follows its much longer discussion of the reasonableness of Higgins' conduct. Its 30 line discussion of "established law" re-states the rule stated in earlier decisions.

Second, *Hernandez* abandons its earlier description of the facts, now stating, "[E]ven after the fourth shot, Hernandez gave the objective appearance of trying to get up." Page 18. Compare that to the Court's earlier statements - Hernandez "had not shown he was in any position to get back up" (Page 14) or Hernandez "placed his left elbow on the street as if to push himself upwards," but, then, "collapsed" (Page 8). *Hernandez* should have said, "Hernandez gave the objective appearance of trying to get up **and failed miserably**."

The *Hernandez* Court does not suggest that Hernandez gave the objective

appearance of: (1) being able to stand; and (2) being able to "close the distance" to Officer McBride before she could protect herself.

Next, *Hernandez* relies heavily on one sentence from *Zion* in which it states, "When police confront a suspect who poses an immediate threat, they may use deadly force against him. But they must stop using deadly force when the suspect no longer poses a threat. We explore the *murky boundary* between these circumstances." 874 F.3d at p. 1075, emphasis added. *Hernandez* interprets the phrase "murky boundary" means the boundary is incapable of being determined. But, *Zion*, apparently, had no difficulty in concluding Zion's constitutional right not to be repeatedly shot while he lay helplessly on the ground was clearly established. *Zion* demonstrates boundaries are, with some effort, easily determined.

The *Hernandez* Court does concede a little, acknowledging that "generally framed rules can still 'create clearly established law' in 'an "obvious" case.' " (Page 20.) But, quickly retreats, stating that this case does not meet that standard. (Page 20.) Why is this not an obvious case? The Opinion does not explain. The Hernandez Court determined the result and, then, backfilled to provide reasons.

Returning to the trope that Hernandez "plainly appeared to continue to try to get up," the *Hernandez* Court concludes, "[E]ven granting that McBride's

fifth and sixth shots may have been unreasonable, this is not an obvious situation in which *every* reasonable officer would have understood that the law forbade firing additional shots at the already wounded Hernandez. . ." (Page 20.) It seems clear that every reasonable police officer should not shoot a person who is seriously wounded, prone on the ground and unable to stand.

" 'While there does not have to be a case directly on point, existing precedent must place the lawfulness of the particular action beyond debate.' *Emmons*, 139 S. Ct. at 504 (cleaned up)." *Bernal v. Sacramento Cnty. Sheriff's Dep't*, 73 F.4th 678, 698 (9th Cir. 2023.) In this particular case, the lawlessness of McBride's acts is beyond debate.

## 4. CONCLUSION

Therefore, appellants request that the Court grant a rehearing en banc.

Dated: May 8, 2024

Respectfully Submitted,

By: /s Gerald P. Peters
Gerald P. Peters
Attorney for Appellants
Estate of Daniel Hernandez, Manuel Hernandez
and Maria Hernandez

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

This brief contains 4,147 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) because:

This brief has been prepared in proportionally spaced typeface using Word 365, size 14 font, Times New Roman.

Signature: /s/ Gerald P. Peters
Attorney for: Appellant Estate of Daniel Hernandez, by and through Successors in Interest, Manuel Hernandez, Maria Hernandez and M.L.H, Manuel Hernandez and Maria Hernandez

Date: May 8, 2024

LAW OFFICE OF

# GERALD PHILIP PETERS

POST OFFICE BOX 6759
THOUSAND OAKS, CALIFORNIA 91359-6759

CERTIFIED SPECIALIST
APPELLATE LAW
THE STATE BAR OF CALIFORNIA
BOARD OF LEGAL SPECIALIZATION

TELEPHONE: (818) 706-1278
FACSIMILE: (818) 706-1278
E-MAIL:
GERALD.PETERS@GMAIL.COM

July 29, 2023

Office of the Clerk
Ninth Circuit Court of Appeals
James R. Browning Courthouse
95 7th Street
San Francisco, Ca 94103

<u>*Estate of Daniel Hernandez v. City of Los Angeles*</u>, Case No. 21-55994

Dear Clerk,

   I am co-counsel for appellant Estate of Daniel Hernandez in this matter. This case concerns a section 1983 case brought against the City of Los Angeles by the heirs of decedent Daniel Hernandez. Oral argument was had on March 2, 2023 at the Pasadena Courthouse. To date, the Court has not issued its opinion in this matter.

   I have become aware of a case published after oral argument which bears on the issue of qualified immunity, the principal defense relied on by the City of Los Angeles.  Attached is a true and correct copy of the decision, issued on March 30, 2023, in the matter of *Rogers v. Jarrett*, 63 F.4th 971 (5th Cir. 2023). Of particular interest is the concurring opinion of Judge Don R. Willet, which discusses critical language, known as the "Notwithstanding Clause," which was erroneously omitted, in 1874, when the Reviser of Statutes consolidated federal laws into one compilation. The error was not corrected and made its way into the United States Code.

   I understand a petition for writ of certiorari has been filed in *Rogers* with the United States Supreme Court regarding this issue.


Very Truly Yours,


/s/ Gerald P. Peters
   Gerald P. Peters


Enclosure.

 Positive

As of: July 29, 2023 5:34 PM Z

## *Rogers v. Jarrett*

United States Court of Appeals for the Fifth Circuit

March 30, 2023, Filed

No. 21-20200

**Reporter**

63 F.4th 971 *; 2023 U.S. App. LEXIS 7576 **; 2023 WL 2706752

KEVION ROGERS, Plaintiff—Appellant, versus JEFFREY JARRETT; JEREMY BRIDGES; TEXAS DEPARTMENT OF CRIMINAL JUSTICE, Defendants—Appellees.

**Prior History:** [**1] Appeal from the United States District Court for the Southern District of Texas. USDC No. 4:19-CV-2330.

*Rogers v. Jarrett, 2021 U.S. Dist. LEXIS 74848, 2021 WL 1433064 (S.D. Tex., Mar. 15, 2021)*

## Core Terms

district court, rights, argues, inmate, deliberate indifference, prison staff, immunity, staffer, qualified immunity, summary judgment, common-law, medical need, collapsed, ceiling, radioed, courts

## Case Summary

### Overview

HOLDINGS: [1]-Summary judgment granted in favor of defendant based on qualified immunity was proper because plaintiff failed to raise a fact dispute on whether the prison officials were each aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and then drew the inference. The evidence indicated that the officials did not perceive any apparent injury and a reasonable jury could not conclude that either of them actually inferred that plaintiff was at substantial risk of serious harm.

### Outcome

Judgment affirmed.

## LexisNexis® Headnotes

Civil Procedure > Appeals > Reviewability of Lower Court Decisions > Preservation for Review

*HN1*[⤓] **Reviewability of Lower Court Decisions, Preservation for Review**

It is not the court's role to raise and discuss legal issues that a party has failed to assert on appeal.

Civil Procedure > Judgments > Summary Judgment > Burdens of Proof

Civil Procedure > Judgments > Summary Judgment > Entitlement as Matter of Law

Civil Procedure > ... > Summary Judgment > Appellate Review > Standards of Review

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of

Law > Genuine Disputes

## HN2[⤓] Summary Judgment, Burdens of Proof

The court reviews summary judgment de novo. Courts may grant summary judgment on an issue only when no genuine dispute as to any material fact exists and the movant is entitled to judgment as a matter of law. A fact dispute is genuine if a reasonable jury could return a verdict for the nonmovant based on the evidence. The court must view all evidence and draw all justifiable inferences in favor of plaintiff, the nonmovant. Still, conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not count for raising a genuine fact dispute.

Evidence > Burdens of Proof > Allocation

## HN3[⤓] Burdens of Proof, Allocation

Plaintiffs bear the burden to demonstrate the inapplicability of the defense. That means plaintiff had to (1) raise a fact dispute on whether his constitutional rights were violated by the defendants' individual conduct, and (2) show those rights were clearly established at the time of the violation.

Constitutional Law > Bill of Rights > Fundamental Rights > Cruel & Unusual Punishment

## HN4[⤓] Fundamental Rights, Cruel & Unusual Punishment

Deliberate indifference is an extremely high standard to meet.

Civil Rights Law > Protection of Rights > Prisoner Rights > Confinement Conditions

Constitutional Law > Bill of Rights > Fundamental Rights > Cruel & Unusual Punishment

Civil Rights Law > Protection of Rights > Prisoner Rights > Medical Treatment

Civil Rights Law > Protection of Rights > Prisoner Rights > Safety

Civil Rights Law > Protection of Rights > Prisoner Rights > Welfare

## HN5[⤓] Prisoner Rights, Confinement Conditions

Prison officials act with deliberate indifference only when they know of and disregard an excessive risk to inmate health or safety.

Constitutional Law > Bill of Rights > Fundamental Rights > Cruel & Unusual Punishment

## HN6[⤓] Fundamental Rights, Cruel & Unusual Punishment

The Supreme Court was clear in Farmer v. Brennan: an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment. The court has likewise been clear: Liability attaches only if officials actually knew— not merely should have known—about the risk. Bottom line: Mere negligence is not enough.

Healthcare Law > Healthcare Litigation > Actions Against Healthcare Workers > Doctors & Physicians

## HN7[⤓] Actions Against Healthcare Workers, Doctors & Physicians

Courts must separately consider the allegations

against physician and non-physician staff alike when deciding deliberate-indifference claims.

Evidence > Burdens of Proof > Allocation

*HN8*[⬇] **Burdens of Proof, Allocation**

Plaintiff has to show that his right's were clearly established at the time of the violation. That takes showing that the violative nature of particular conduct is clearly established. It just isn't enough to identify a right as a broad general proposition.

Civil Procedure > Appeals > Oral Arguments

Civil Procedure > Appeals > Reviewability of Lower Court Decisions > Preservation for Review

*HN9*[⬇] **Appeals, Oral Arguments**

The court cannot and will not consider arguments raised for the first time at oral argument.

Civil Rights Law > Protection of Rights > Prisoner Rights > Medical Treatment

Constitutional Law > Bill of Rights > Fundamental Rights > Cruel & Unusual Punishment

*HN10*[⬇] **Prisoner Rights, Medical Treatment**

All the court recognized in Sims was what had already been clearly established in our circuit: A prisoner can show his clearly established rights under the *U.S. Const. amend. VIII* were violated if a prison official refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs. The court has held officials liable for violating that standard before, including when the record supported that they:• offered no treatment

options to a patient with a history of cardiac problems who was experiencing severe chest pains; • knew a prisoner had swallowed a bag full of drugs, vomited multiple times, screamed for help, pleaded to go to the hospital, and had steadily deteriorated since his arrival at the jail; and• personally witnessed a prisoner's head being struck repeatedly, causing him to go unconscious.

**Counsel:** For Kevion Rogers, Plaintiff - Appellant: Matthew J. Kita, Dallas, TX; Damon E. Mathias, Mathias Raphael, P.L.L.C., Dallas, TX.

For Jeffrey Jarrett, Jeremy Bridges, Texas Department of Criminal Justice, Defendants - Appellees: Marlayna Marie Ellis, Jason T. Bramow, Assistant Attorney General, Office of the Attorney General, Austin, TX; Ryan Baasch, Office of the Texas Attorney General, Austin, TX.

**Judges:** Before RICHMAN, Chief Judge, and WIENER and WILLETT, Circuit Judges. Don R. Willett, Circuit Judge, concurring.

**Opinion by:** DON R. WILLETT

## Opinion

[*974] Don R. Willett, *Circuit Judge*:

A trusted prison inmate was working unsupervised in a hog barn when the ceiling collapsed, striking him in the head. He told the prison agricultural specialist that he needed medical attention. But the specialist thought the inmate looked no worse for wear and ordered him back to work. A short while later, the inmate asked another prison staffer for medical attention. The staffer radioed a supervisor. Based on the staffer's report, the supervisor, too, thought nothing serious had happened and did not immediately grant the request. The inmate's [**2] condition later worsened. He was sent to the hospital and diagnosed with a traumatic brain injury. The district court granted summary judgment to Defendants based on qualified immunity. For the reasons below, we AFFIRM.

## I

Kevion Rogers was a trusted inmate. Prison staff let Rogers work unsupervised and outside the prison's security fence. Rogers's daily job was to help take care of the prison's hogs. One day Rogers went into one of the prison's hog barns looking for a powder used to keep baby hogs healthy. As he was leaving, part of the barn's ceiling collapsed and hit him on the head. Rogers blacked out.

After he came to, another inmate took Rogers to see the prison's staff agricultural specialist, Jeffrey Jarrett. Rogers walked normally into Jarrett's office. And though Rogers "had dust on him," his only visible injury was a scraped knee. An agitated Rogers demanded "to go to the infirmary." But from Jarrett's perspective, Rogers "looked fine." Rogers didn't "look hurt," and spoke without a slur. Jarrett told Rogers to keep looking for the powder. Rogers walked normally out of the office. He did not see Jarrett again that morning. Jarrett's job responsibilities took him away from the [**3] prison to another unit.

Rogers tried to go on about his business. But he was "lightheaded" and had to sit down. Other inmates tried to keep him awake as he drifted "in and out of consciousness." Soon after another prison staffer arrived to get the inmates ready for lunch. Rogers told the staffer that "the ceiling collapsed on [his] head" and showed the staffer the "debris." Rogers again asked for medical attention. The staffer radioed Jarrett's supervisor, Jeremy Bridges, and informed him "that the ceiling had fallen on [Rogers's] head and that [Rogers] had sustained a head injury." Bridges radioed back to take Rogers "back to [his] bunk" so Bridges could "take a look at [him] later." But Rogers objected—he still wanted "to go eat lunch." Rogers's objection made Bridges think whatever injuries Rogers had were not "serious." Bridges radioed back that going to lunch was fine. He'd be out to check on Rogers "soon."

For whatever reason though, Rogers was still brought back to his bunk. By the time he reached his dormitory his condition had begun to deteriorate. His head and eyes had begun to swell, his face was bruising, and he was showing signs of respiratory distress. Prison staff at the [**4] dormitory thought this was "abnormal," and so Rogers was redirected to the prison's administrative building. He collapsed on the way there, began to "seize violently," and started "vomiting." Rogers "lost consciousness." Within minutes prison staff at the administrative building summoned medical assistance. Emergency medical services evacuated Rogers to a nearby hospital by helicopter. Hospital staff diagnosed Rogers with a "traumatic brain injury; no hemorrhage."[1]

[*975] Rogers sued Jarrett, Bridges, and the Texas Department of Criminal Justice in Texas state court. Under *42 U.S.C. § 1983*, Rogers alleged that prison staff violated his *Eighth* and *Fourteenth Amendment* rights by acting with deliberate indifference towards him. Under the Texas Tort Claims Act, Rogers alleged premises-liability claims. Defendants removed the case to federal court and moved for summary judgment on all claims. The district court granted summary judgment to Defendants on Rogers's *§ 1983* claims, declined to exercise supplemental jurisdiction over his TTCA claims, and remanded the case to state court. Rogers timely appealed. He argues that Jarrett and Bridges were deliberately indifferent towards his serious medical needs and thus not entitled to qualified immunity. [**5] [2]

---

[1] Hospital staff released Rogers back to the prison the next day with prescriptions for pain and anti-nausea medication. The district court found "no evidence in the record of subsequent problems or complications."

[2] Rogers was represented by counsel in the district court and here. He also argued in the district court that Defendants were deliberately indifferent towards his safety by having him work in the hog barn. He did not raise that theory in his opening brief. Likewise, Rogers raised no claims against TDCJ in his opening brief. He also did not raise the district court's refusal to exercise supplemental jurisdiction. *HN1*[⬆] It is not our role to "raise and discuss legal issues that [a party] has failed to assert" on appeal. *Brinkmann v. Dall. Cnty. Deputy Sheriff Abner, 813 F.2d 744, 748 (5th Cir. 1987)*. So Rogers has abandoned those issues and arguments. *Id.*

## II

_HN2_[⬆] We review summary judgment de novo.[3] Courts may grant summary judgment on an issue only when "no genuine dispute as to any material fact" exists "and the movant is entitled to judgment as a matter of law."[4] A fact dispute is "genuine" if "a reasonable jury could return a verdict for [the nonmovant] based on the evidence."[5] "[W]e must view all evidence and draw all justifiable inferences in favor of [Rogers], the nonmovant."[6] Still, "[c]onclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation" do not count for raising a genuine fact dispute.[7]

## III

Rogers contends that the district court improperly granted Jarrett and Bridges qualified immunity. _HN3_[⬆] We have explained before that plaintiffs bear the "burden" to "demonstrate the inapplicability of the defense."[8] And Rogers had to meet that burden for _each_ defendant.[9] That means Rogers had to (1) raise a fact dispute on whether his constitutional rights were violated by the defendants' individual conduct, and (2) show those rights were "clearly established at the time of the violation."[10] On this record, Rogers failed to meet

---

[3] _Batiste v. Lewis, 976 F.3d 493, 500 (5th Cir. 2020)_.

[4] _Id._ (quoting _Rogers v. Bromac Title Servs., L.L.C., 755 F.3d 347, 350 (5th Cir. 2014)_).

[5] _Coleman v. BP Expl. & Prod., Inc., 19 F.4th 720, 726 (5th Cir. 2021)_.

[6] _Id._

[7] _Id._ (quoting _TIG Ins. Co. v. Sedgwick James of Wash., 276 F.3d 754, 759 (5th Cir. 2002)_).

[8] _McClendon v. City of Columbia, 305 F.3d 314, 323 (5th Cir. 2002)_ (en banc) (per curiam).

[9] _See Thompson v. Steele, 709 F.2d 381, 382 (5th Cir. 1983)_ ("Personal involvement is an essential element of a civil rights cause of action.").

[10] _See Brown v. Callahan, 623 F.3d 249, 253 (5th Cir. 2010)_.

either prong.

## A

Rogers contends that [**6] he raised a fact dispute on a constitutional violation. [*976] He argues that both Jarrett and Bridges acted with deliberate indifference towards his serious medical needs, violating his _Eighth Amendment_ rights in the process. _HN4_[⬆] But "[d]eliberate indifference is an extremely high standard to meet."[11] As the Supreme Court has explained, Rogers needed to raise a fact dispute on whether Jarrett and Bridges were each "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and actually "dr[ew] the inference."[12] And _serious_ harm isn't just any harm. Rogers's medical need had to be "so apparent that even laymen would recognize that care is required."[13] The district court found "no evidence that would permit a jury to infer that Jarrett and Bridges had subjective knowledge of the severity of Rogers's condition." We agree with the district court.

A reasonable jury could not conclude on this record that either Jarrett or Bridges actually inferred that Rogers was at substantial risk of serious harm. As the district court noted, the record supports that both Jarrett and Bridges knew that Rogers had been hit in the head. But as recounted above, [**7] Jarrett did not perceive any apparent injury to Rogers other than a scraped knee. From Jarrett's perspective, Rogers was "look[ing] alright" and "[didn't] look hurt." Rogers "had dust on him," but did not have visible injuries, did not slur his speech, and walked normally into and out of Jarrett's office.

---

[11] _Domino v. Tex. Dep't of Crim. Just., 239 F.3d 752, 756 (5th Cir. 2001)_.

[12] _Farmer v. Brennan, 511 U.S. 825, 837, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)_; _HN5_[⬆] _see also Stewart v. Murphy, 174 F.3d 530, 534 (5th Cir. 1999)_ (explaining that prison officials act with deliberate indifference only when they "_know_[] _of and disregard_[] an excessive risk to inmate health or safety" (quoting _Farmer, 429 U.S. at 837_)).

[13] _See Gobert v. Caldwell, 463 F.3d 339, 345 n.12 (5th Cir. 2006)_.

The same goes for Bridges. All he knew about Rogers's injuries was what he'd been told over the radio: that Rogers "had sustained a head injury" after a ceiling collapse. But Bridges testified that he did not think it was a particularly severe injury since Rogers had requested "to go eat lunch" while he waited for Bridges to come see him. Indeed, Rogers did not develop severe symptoms—seizures, vomiting, and loss of consciousness—until later on. And once he did, prison staff rendered medical aid within minutes.

Rogers disagrees. He argues that fact disputes over what happened preclude summary judgment; that the district court misapplied the deliberate-indifference standard; and that Supreme Court and our caselaw compel a contrary conclusion. We are unconvinced.

*First*, Rogers argues "that there is a genuine issue of material fact in dispute as to *what actually happened* on the morning [**8] of the incident," precluding summary judgment under our decisions. But the district court analyzed Rogers's claim under his version of events. And Jarrett and Bridges do not dispute what they knew when. Rather, the only dispute on appeal is what *inferences* Jarrett and Bridges drew from what they knew. Because the inferences Rogers asks us to make are speculative, this argument fails.[14]

*Second*, Rogers argues that the district court misapplied the deliberate-indifference standard. In Rogers's view, "the ultimate question" that his claim turns on is "was [he] exposed to a 'substantial risk of serious harm'"? But that misstates the standard. It is not enough for Rogers to have raised a fact dispute on whether Jarrett and Bridges "actually drew the inference that [a] *potential* for [*977] harm existed," as Rogers argues. *HN6*[⬆] The Supreme Court was clear in *Farmer v. Brennan*: "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot

under our cases be condemned as the infliction of punishment."[15] We have likewise been clear: "[L]iability attaches only if [officials] actually knew—not merely should have known—about the risk."[16] Bottom line: Mere [**9] negligence is not enough.

*Third*, Rogers misreads Supreme Court and circuit caselaw. "[T]he takeaway" from the Supreme Court's decision in *Estelle v. Gamble*[17] is not that nonphysician prison staff are "expected to allow prisoners to consult medical experts because they themselves are not qualified to diagnose or treat . . . medical condition[s]," as Rogers suggests. *HN7*[⬆] The takeaway is that courts must "separately consider" the allegations against physician and nonphysician staff alike when deciding deliberate-indifference claims.[18] And our decision in *Austin v. Johnson*[19] adds little, if anything, to support Rogers's claims. Rogers admits that his case is "unlike" *Austin* because neither Jarrett nor Bridges "failed to get medical treatment for [him] after [seeing] his conditions worsening."[20]

B

In sum, Rogers failed to raise a fact dispute over whether Jarrett and Bridges acted with deliberate indifference. But even if he had, he'd still need to show that his rights were "clearly established at the

---

[14] *Coleman, 19 F.4th at 726.*

[15] *511 U.S. at 838.*

[16] *Olabisiomotosho v. City of Houston, 185 F.3d 521, 528 (5th Cir. 1999).*

[17] *429 U.S. 97, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).*

[18] *See id. at 108* ("The Court of Appeals focused primarily on the alleged actions of the doctors, and did not separately consider whether the allegations against the [nonphysician defendants] stated a cause of action.").

[19] *328 F.3d 204 (5th Cir. 2003).*

[20] *See id. at 210* (holding that "failure to call an ambulance for almost two hours while [a minor] lay unconscious and vomiting" after an afternoon of forced exercise "rises to the level of deliberate indifference").

time of the violation."[21] *HN8*[⬆] As we have explained many times, that takes showing that "the violative nature of *particular* conduct is clearly established."[22] It just isn't enough to identify a right as "a [**10] broad general proposition."[23] The district court did not address qualified immunity's second step. Jarrett and Bridges argue, though, that even assuming a violation, the law was not clearly established under this standard. We agree with Jarrett and Bridges.

In barely half a page of briefing Rogers argues that the Supreme Court's decision in *Estelle* "clearly established [the] law govern[ing] the substance of this entire dispute." But the only right Rogers identifies as being violated was his right to be free from deliberate indifference towards his serious medical needs. That generalized proposition of law is not enough. The Supreme Court has articulated an exacting standard. Rogers needed to point to "a case or body of relevant case law in which an officer acting under similar circumstances was held to have violated the Constitution."[24] And *Estelle* just isn't that [*978] case. The Supreme Court *reversed* us in *Estelle* that the doctors had acted with deliberate indifference towards the prisoner.[25] And on remand, we held that the nonphysician prison staff likewise didn't act with deliberate indifference.[26] Therefore, we cannot agree with Rogers that he has shown that Jarrett and Bridges violated clearly [**11] established law.

For the first time at oral argument, though, Rogers's counsel argued that our recent decision in *Sims v. Griffin*[27] supports that Jarrett and Bridges violated clearly established law. *HN9*[⬆] "[W]e cannot and will not consider arguments raised for the first time at oral argument."[28] Under the Rules of Appellate Procedure, Counsel should have advised us of any "pertinent and significant authorities" that had come to his attention after briefing had concluded "*by letter.*"[29] But even had Rogers's counsel filed that letter, *Sims* is not the helpful precedent he thinks it is.

*HN10*[⬆] All we recognized in *Sims* was what had already been clearly established in our circuit: "[A] prisoner can show his clearly established rights under the *Eighth Amendment* were violated if a prison official 'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any *serious medical needs.*'"[30] We have held officials liable for violating that standard before, including when the record supported that they:

- "offered no treatment options to a patient with a history of cardiac problems who was experiencing severe chest pains;"[31]

- "knew [a prisoner] had [**12] swallowed a bag full of drugs, vomited multiple times, screamed for help, pleaded to go to the hospital, and had steadily deteriorated since his arrival at the jail;"[32] and

- personally witnessed a prisoner's head being struck "repeatedly," causing him to go

---

[21] *Brown, 623 F.3d at 253.*

[22] *Mullenix v. Luna, 577 U.S. 7, 12, 136 S. Ct. 305, 193 L. Ed. 2d 255 (2015)* (per curiam) (quoting *Ashcroft v. al-Kidd, 563 U.S. 731, 742, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011)*).

[23] *Id.* (quoting *Brosseau v. Haugen, 543 U.S. 194, 198, 125 S. Ct. 596, 160 L. Ed. 2d 583 (2004)* (per curiam)).

[24] *Batyukova v. Doege, 994 F.3d 717, 726 (5th Cir. 2021)* (cleaned up).

[25] *429 U.S. at 107-08.*

[26] *554 F.2d 653, 653-54 (5th Cir. 1977)* (per curiam).

[27] *35 F.4th 945 (5th Cir. 2022).*

[28] *Jackson v. Gautreaux, 3 F.4th 182, 188 n.* (5th Cir. 2021).*

[29] *See FED. R. APP. P. 28(j)* (emphasis added).

[30] *35 F.4th at 951* (quoting *Easter v. Powell, 467 F.3d 459, 465 (5th Cir. 2006)* (per curiam)) (emphasis added).

[31] *Easter, 467 F.3d at 465.*

[32] *Sims, 35 F.4th at 952.*

"unconscious."[33]

Rogers, though, would have us read these cases as clearly establishing that *any* report of *any* strike to a prisoner's head is enough to trigger a duty for officials to seek advanced medical care for the prisoner. They do not. No reasonable official would read them that way, and so we disagree with Rogers's formulation of clearly established law.[34]

IV

What happened to Rogers was unfortunate. Maybe it was negligent. But was it the product of deliberate indifference? Not on this record. And even if it were, these officials did not violate clearly established **[*979]** law on these facts. Bound by our controlling immunity precedent, we AFFIRM.

**Concur by:** Don R. Willett

# Concur

DON R. WILLETT, *Circuit Judge*, concurring:

Today's decision upholding qualified immunity is compelled by our controlling precedent. I write separately only to highlight newly published scholarship that paints the qualified-immunity doctrine as flawed—foundationally—from its **[**13]** inception.[1]

For more than half a century, the Supreme Court has claimed that (1) certain common-law immunities existed when § 1983 was enacted in 1871,[2] and (2) "no evidence" suggests that Congress meant to abrogate these immunities rather than incorporate them.[3] But what if there *were* such evidence? Indeed, what if the Reconstruction Congress had explicitly stated—right there in the original statutory text—that it was nullifying all common-law defenses against § 1983 actions? That is, what if Congress's literal language unequivocally negated the original interpretive premise for qualified immunity? Professor Alexander Reinert argues precisely this in his new article, *Qualified Immunity's Flawed Foundation*— that courts have been construing the wrong version of § 1983 for virtually its entire legal life.

Wait, what?

As passed by the Reconstruction Congress, *Section 1 of the Civil Rights Act of 1871* (now colloquially known as § 1983) read this way:

> [A]ny person who, under color of any law, statute, ordinance, regulation, custom, or usage of any State, shall subject, or cause to be subjected, any person within the jurisdiction of the United States **[**14]** to the deprivation of any rights, privileges, or immunities secured by the Constitution of the United States, shall, *any such law, statute, ordinance, regulation, custom, or usage of the State to the contrary notwithstanding*, be liable to the party injured in any action at law, suit in equity, or other

---

[33] *Moore v. LaSalle Mgmt. Co., 41 F.4th 493, at 502 (5th Cir. 2022)*.

[34] *See Buehler v. Dear, 27 F.4th 969, 981 (5th Cir. 2022)* ("Although the plaintiff need not identify 'a case *directly* on point' in order to make such a showing, he or she must point to 'authority at a sufficiently high level of specificity to put a reasonable official on notice that his conduct is definitively unlawful.'" (quoting *Vincent v. City of Sulphur, 805 F.3d 543, 547 (5th Cir. 2015)*).

[1] Alexander A. Reinert, *Qualified Immunity's Flawed Foundation, 111 Cal. L. Rev. 201 (2023)* ("This Article takes aim at the roots of the doctrine—fundamental errors that have never been excavated.").

[2] *Pierson v. Ray, 386 U.S. 547, 556-57, 87 S. Ct. 1213, 18 L. Ed. 2d 288 (1967)* (tethering qualified immunity to common-law defenses that existed circa 1871, like subjective good faith). Professor William Baude has challenged this historical premise—forcefully and methodically—arguing that qualified immunity departs significantly from traditional common-law principles. *See* William Baude, *Is Qualified Immunity Unlawful?, 106 Cal. L. Rev. 45, 49-60 (2018)*. Professor Joanna Schwartz likewise questions the doctrine's origins, contending there were no common-law immunities. *See* Joanna C. Schwartz, *The Case Against Qualified Immunity, 93 Notre Dame L. Rev. 1797 (2018)*.

[3] *Briscoe v. Lahue, 460 U.S. 325, 337, 103 S. Ct. 1108, 75 L. Ed. 2d 96 (1983)* ("[W]e find no evidence that Congress intended to abrogate the traditional common-law . . . immunity in § 1983 actions.").

proper proceeding for redress . . . .[4]

The italicized language—the "Notwithstanding Clause," as Professor Reinert calls it—explicitly displaces common-law defenses.[5] The language that Congress [*980] passed makes clear that § 1983 claims are viable notwithstanding "any such law, statute, ordinance, regulation, custom, or usage of the State to contrary." The language is unsubtle and categorical, seemingly erasing any need for unwritten, gap-filling implications, importations, or incorporations. Rights-violating state actors are liable—period—*notwithstanding* any state law to the contrary.

Then things went off the rails, quickly and stealthily. For reasons lost to history, the critical "Notwithstanding Clause" was inexplicably omitted from the first compilation of federal law in 1874.[6] The Reviser of Federal Statutes made an unauthorized alteration to Congress's language. And that error [**15] was compounded when the various revised statutes were later published in the first United States Code in 1926. The Reviser's error, whether one of omission or commission, has never been corrected. Today, 152 years after Congress enlisted the federal courts to secure Americans' constitutional rights, if one were to Google "*42 U.S.C. § 1983*," the altered version that pops up says nothing about common-law defenses. According to Professor Reinert, that fateful, unexplained omission means that courts and scholars have never "grappled" with the

Notwithstanding Clause's significance.[7]

All to say, the Supreme Court's original justification for qualified immunity—that Congress wouldn't have abrogated common-law immunities absent explicit language—is faulty because the 1871 Civil Rights Act *expressly included such language*. Those sixteen lost words, by presumably encompassing state common-law principles, undermine the doctrine's long-professed foundation and underscore that what the 1871 Congress meant for state actors who violate Americans' federal rights is not immunity, but liability—indeed, liability *notwithstanding* any state law to the contrary.[8]

These are game-changing arguments, particularly in this text-centric judicial era when jurists profess unswerving fidelity to the words Congress chose. Professor Reinert's scholarship supercharges the

---

[4] *Civil Rights Act of 1871, ch. 22, § 1, 17 Stat. 13 (1871)*.

[5] Reinert, *supra* at 235 and n.230 (observing that "this clause meant to encompass state common law principles," noting that this understanding—that "custom or usage" was synonymous with common law—was, "after all," why the Court overruled *Swift v. Tyson, 41 U.S. 1, 10 L. Ed. 865 (1842)*, in *Erie R.R. Co. v. Tompkins, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938)*, and also citing *W. Union Tel Co. v. Call Pub. Co., 181 U.S. 92, 102, 21 S. Ct. 561, 45 L. Ed. 765 (1901)*, which in turn cites BLACK'S LAW DICTIONARY for the proposition that common law derives from "usages and customs").

[6] Reinert, *supra* at 207, 237.

---

[7] *Id.* at 236, 244.

[8] Beyond excavating the long-lost text of what the Reconstruction Congress actually passed, Professor Reinert asserts a second fundamental misstep: qualified immunity is rooted in a flawed application of the checkered "Derogation Canon." This canon of statutory interpretation urges that statutes in "derogation" of the common law should be strictly construed. The Court misapplied this canon, says Professor Reinert, reading § 1983's silence regarding immunity as implicit *adoption* of common-law immunity defenses rather than *rejection* of them. *Id. at 211 n.56* (collecting cases). Professor Reinert maintains that the Derogation Canon has always rested on shaky ground, with Justice Scalia, writing with lexicographer Bryan Garner, branding it "a relic of the courts' historical hostility to the emergence of statutory law." *Id. at 218* (citing ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS [**16] 318 (2012)). Even more importantly, Reconstruction-era legislators would not have understood the canon as operating to dilute § 1983 by implying common-law defenses. Why? Because since the Founding era, the Supreme Court had only used the Derogation Canon (criticized by mid-nineteenth courts and treatises for arrogating power to judges) to protect preexisting common law *rights*, never to import common law *defenses* into new remedial statutes. *Reinert, supra at 221-28*. In short, the Derogation Canon does not validly apply to defenses. The more applicable canon, around which Reconstructionera courts *had* coalesced, was a contrary one: remedial statutes—such as § 1983—should be read broadly. *Id. at 219, 227-28*. In any event, as argued above, even if the Derogation Canon *did* apply to defenses, the as-passed language of § 1983 explicitly displaced any existing common-law immunities.

critique that modern immunity jurisprudence is not just *a*textual but *counter*textual. **[\*981]** That is, the doctrine does not merely *complement* the text—it brazenly *contradicts* it.

In arguing that qualified immunity is flawed from the ground up, Professor Reinert poses a provocative question: "If a legislature enacts a statute, but no one bothers to read it, does it still have interpretive force?"[9] It seems a tall order to square the modern qualified-immunity regime with Congress's originally enacted language. But however seismic the implications of this lost-text research, "'[a]s middle-management circuit judges,' we cannot overrule the Supreme Court."[10] Only that Court can definitively grapple with *§ 1983*'s enacted text and decide whether it means what it says—and what, if anything, that means for *§ 1983* immunity jurisprudence.[11]

End of Document

---

[9] *Id.* at 246.

[10] *Sims v. Griffin, 35 F.4th 945, 951 n.17 (5th Cir. 2022)* (quoting *Whole Woman's Health v. Paxton, 978 F.3d 896, 920 (5th Cir. 2020)* (Willett, J., dissenting), *rev'd en banc, 10 F.4th 430 (5th Cir. 2021)*).

[11] Not all Supreme Court Justices have overlooked the Notwithstanding Clause. In *Butz v. Economou*, the Court quoted the as-passed statutory language, including the Notwithstanding Clause, yet, **[\*\*17]** in the same breath, remarked that *§ 1983*'s originally enacted text "said nothing about immunity for state officials." *438 U.S. 478, 502-03, 98 S. Ct. 2894, 57 L. Ed. 2d 895 & n.29 (1978)* (citing *Pierson v. Ray, 386 U.S. 547, 87 S. Ct. 1213, 18 L. Ed. 2d 288 (1967)*, *Imbler v. Pachtman, 424 U.S. 409, 96 S. Ct. 984, 47 L. Ed. 2d 128 (1976)*, and *Scheuer v. Rhodes, 416 U.S. 232, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974)*). Indeed, members of the Supreme Court have often noted the Notwithstanding Clause's existence and omission from the U.S. Code. *See Hague v. Comm. for Indus. Org., 307 U.S. 496, 510, 59 S. Ct. 954, 83 L. Ed. 1423 (1939)*; *Monroe v. Pape, 365 U.S. 167, 228, 81 S. Ct. 473, 5 L. Ed. 2d 492 (1961)* (Harlan, J., concurring); *Adickes v. S. H. Kress & Co., 398 U.S. 144, 203 n.15, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970)* (Brennan, J., concurring); *see also Screws v. United States, 325 U.S. 91, 99 n.8, 65 S. Ct. 1031, 89 L. Ed. 1495 (1945)* (quoting the originally enacted text, including the Notwithstanding Clause; *Monroe, 365 U.S. at 181 n.27* (majority) (same); *Examining Bd. of Eng'rs, Architects, & Surveyors v. Flores de Otero, 426 U.S. 572, 582 n.11, 96 S. Ct. 2264, 49 L. Ed. 2d 65 (1976)* (same); *Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691-92, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)* (same); *Chapman v. Hous. Welfare Rights Org., 441 U.S. 600, 608 n.15, 99 S. Ct. 1905, 60 L. Ed. 2d 508 (1979)* (same); *Briscoe v. LaHue, 460 U.S. 325, 357 n.17, 103 S. Ct. 1108, 75 L. Ed. 2d 96 (1983)* (Marshall, J., dissenting) (same); *Wilson v. Garcia, 471 U.S. 261, 262 n.1, 105 S. Ct. 1938, 85 L. Ed. 2d 254 (1985)* (same); *Jett v. Dall. Indep. Sch. Dist., 491 U.S. 701, 723, 109 S. Ct. 2702, 105 L. Ed. 2d 598 (1989)* (same); *Ngiraingas v. Sanchez, 495 U.S. 182, 188 n.8, 110 S. Ct. 1737, 109 L. Ed. 2d 163 (1990)* (same).

9th Circuit Case Number: 21-55994

CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on July 29, 2023.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signature: /s/ Gerald P. Peters

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

ESTATE OF DANIEL HERNANDEZ, by and through successors in interest, Manuel Hernandez, Maria Hernandez and M.L.H.; MANUEL HERNANDEZ, individually; MARIA HERNANDEZ, individually,

*Plaintiffs-Appellants,*

and

M. L. H., a minor, by and through her guardian ad litem Claudia Sugey Chavez,

*Plaintiff,*

v.

CITY OF LOS ANGELES; LOS ANGELES POLICE DEPARTMENT; TONI MCBRIDE,

*Defendants-Appellees.*

No. 21-55994

D.C. Nos.
2:20-cv-04477-SB-KS
2:20-cv-05154-DMG-KS

OPINION

| | |
|---|---|
| M. L. H., a minor, by and through her guardian ad litem Claudia Sugey Chavez, | No. 21-55995 |
| | D.C. Nos. |
| *Plaintiff-Appellant,* | 2:20-cv-04477-SB-KS |
| | 2:20-cv-05154-DMG-KS |
| and | |
| ESTATE OF DANIEL HERNANDEZ, by and through successors in interest, Manuel Hernandez, Maria Hernandez and M.L.H.; MANUEL HERNANDEZ, individually; MARIA HERNANDEZ, individually, | |
| *Plaintiffs,* | |
| v. | |
| CITY OF LOS ANGELES; LOS ANGELES POLICE DEPARTMENT; TONI MCBRIDE, | |
| *Defendants-Appellees.* | |

Appeal from the United States District Court
for the Central District of California
Stanley Blumenfeld, Jr., District Judge, Presiding

Argued and Submitted March 2, 2023
Pasadena, California

Filed March 21, 2024

Before: Milan D. Smith, Jr., Daniel P. Collins, and
Kenneth K. Lee, Circuit Judges.

Opinion by Judge Collins

---

## SUMMARY[*]

---

### Deadly Force/Qualified Immunity

The panel affirmed the district court's grant of summary judgment to the City of Los Angeles, the Los Angeles Police Department ("LAPD"), and Officer McBride on plaintiffs' federal claims, and reversed the district court's grant of summary judgment on several of plaintiffs' state law claims in plaintiffs' 42 U.S.C. § 1983 action arising from the shooting death of Daniel Hernandez during a confrontation with LAPD officers.

Affirming the district court's grant of summary judgment to McBride, the officer who shot Hernandez, on plaintiffs' Fourth Amendment excessive force claim, the panel held that although a reasonable jury could find that the force employed by McBride in firing her fifth and sixth shots at Hernandez was excessive, she was nonetheless entitled to

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

qualified immunity because McBride did not violate clearly established law.

Affirming the district court's grant of summary judgment to all defendants on plaintiffs' Fourteenth Amendment claim, the panel held that plaintiffs failed to show that McBride acted with a purpose to harm without regard to legitimate law enforcement objectives, and therefore there was no Fourteenth Amendment violation.

Affirming the district court's grant of summary judgment to the City of Los Angeles and the LAPD on plaintiffs' *Monell* claim, the panel agreed with the district court that even if there was an underlying constitutional violation, plaintiffs failed to provide any basis for holding the City and LAPD liable for McBride's shooting of Hernandez.

The panel reversed the district court's grant of summary judgment to defendants with respect to plaintiffs' state law claims for assault, wrongful death, and violation of the Bane Act. Because the reasonableness of McBride's final volley of shots presented a question for a trier of fact, the district court erred in dismissing these state law claims based on its determination that McBride's use of force was reasonable.

---

## COUNSEL

Gerald P. Peters (argued), Law Office of Gerald Philip Peters, Thousand Oaks, California; Arnoldo Casillas, Casillas & Associates, Long Beach, California; Denisse O. Gastelum, Gastelum Law APC, Long Beach, California; for Plaintiff-Appellants Estate of Daniel Hernandez, Manuel Hernandez and Maria Hernandez.

Narine Mkrtchyan (argued), Glendale, California; Melanie
T. Partow, Law Offices of Melanie Partow, Long Beach,
California; Paul L. Hoffman, Schonbrun Seplow Harris
Hoffman & Zeldes LLP, Hermosa Beach, California; for
Plaintiff-Appellant M.L.H.

Kevin E. Gilbert (argued) and Carolyn Aguilar, Orbach Huff
& Henderson LLP, Pleasanton, California; Colleen R. Smith
and Jonathan H Eisenman, Deputy City Attorneys, Los
Angeles City Attorney's Office, Los Angeles, California; for
Defendants-Appellees.

James L. Buchal, Murphy & Buchal LLP, Portland, Oregon,
for Amicus Curiae National Police Association.

## OPINION

COLLINS, Circuit Judge:

These consolidated actions under 42 U.S.C. § 1983 arise
from the shooting death of Daniel Hernandez during a
confrontation with officers of the Los Angeles Police
Department ("LAPD") on April 22, 2020. Plaintiffs-
Appellants, who are the Estate, parents, and minor daughter
of Hernandez, asserted a variety of federal and state law
claims against the City of Los Angeles ("City"), the LAPD,
and the officer who shot Hernandez, Toni McBride. The
district court granted summary judgment to Defendants on
all claims, and Plaintiffs appeal. We conclude that, although
a reasonable jury could find that the force employed by
McBride was excessive, she is nonetheless entitled to
qualified immunity on Plaintiffs' Fourth Amendment
excessive force claim. We also hold that the district court

properly granted summary judgment to all Defendants on Plaintiffs' remaining federal claims. However, because the reasonableness of McBride's force presents a triable issue, the district court erred in granting summary judgment on that basis as to certain of Plaintiffs' state law claims. Accordingly, we affirm in part, reverse in part, and remand.

# I

## A

During the late afternoon of April 22, 2020, uniformed officers Toni McBride and Shuhei Fuchigami came upon a multi-vehicle accident at the intersection of San Pedro Street and East 32nd Street in Los Angeles. They decided to stop and investigate the situation. Video footage from the patrol car and from McBride's body camera captured much of what then transpired.[1]

As the officers arrived near the intersection, they observed multiple seriously damaged vehicles, some with people still inside, and at least two dozen people gathered at the sides of the road. As the officers exited their patrol car, the car's police radio stated that the "suspect's vehicle" was "black" and that the suspect was a "male armed with a knife." A bystander immediately told the officers about someone trying to "hurt himself," and Fuchigami stated loudly, "Where is he? Where's he at?" In response, several bystanders pointed to a black pickup truck with a heavily damaged front end that was facing in the wrong direction

---

[1] Because no party contends these videotapes were "doctored" or "altered," or that they lack foundation, we "view[] the facts in the light depicted by the videotape." *See Scott v. Harris*, 550 U.S. 372, 378, 380–81 (2007). However, to the extent that a fact is not clearly established by the videotape, we view the evidence "in the light most favorable to the nonmoving part[ies]," *i.e.*, Plaintiffs. *Id.* at 380.

near two parked vehicles on the southbound side of San Pedro Street. The officers instructed the crowd to get back, and McBride drew her weapon. One nearby driver, who was sitting in her stopped sedan, told McBride through her open car window that "he has a knife." McBride asked her, "Why does he want to hurt himself?" and the bystander responded, "We don't know. He's the one who caused the accident." McBride instructed that bystander to exit her car and go to the sidewalk, which she promptly did. McBride then shouted to the bystanders in both English and Spanish that they needed to get away. At the same time, the police radio announced that the suspect was "cutting himself" and was "inside his vehicle." McBride then asked her partner, "Do we have less lethal?" Referencing the smashed pickup truck, McBride said, "Is there anybody in there?" She then stated, "Hey, partner, he might be running."

As McBride faced the passenger side of the truck, which was down the street, she then saw someone climb out of the driver's side window. McBride yelled out, "Hey man, let me see your hands. Let me see your hands man," while a bystander yelled, "He's coming out!" Daniel Hernandez then emerged shirtless from behind the smashed black pickup truck, holding a weapon in his right hand. As he did so, Officer McBride held her left hand out towards Hernandez and shouted, "Stay right there!" Hernandez nonetheless advanced towards McBride in the street, and he continued to do so as McBride yelled three times, "Drop the knife!" While Hernandez was coming towards her, McBride backed up several steps, until she was standing in front of the patrol car.

Hernandez began yelling as he continued approaching McBride, and he raised his arms out by his sides to about a 45-degree angle. McBride again shouted, "Drop it!" As

Hernandez continued yelling and advancing with his arms out at a 45-degree angle, Officer McBride fired an initial volley of two shots, causing Hernandez to fall to the ground on his right side, with the weapon still in his right hand. At the point that McBride fired at Hernandez, he was between 41–44 feet away from her.

Still shouting, Hernandez rolled over and leaned his weight on his hands, which were pressed against the pavement. He began pushing himself up, and he managed to get his knees off the pavement. As Hernandez started shifting his weight to his feet to stand up, McBride again yelled "Drop it!" and fired a second volley of two shots, causing Hernandez to fall on his back with his legs bent in the air, pointing away from McBride. Hernandez began to roll over onto his left side, and as he did this, McBride fired a fifth shot. Hernandez then continued to roll over, so that he was again facing McBride. His bent left knee was pressed against the ground, and he placed his left elbow on the street, as if to push himself upwards. But Hernandez started to collapse to the ground, and just as he did so, McBride fired a sixth shot. Hernandez then lay still, face-down on the street, as McBride and other officers approached him with their pistols drawn. McBride's body camera clearly shows that the weapon was still in Hernandez's right hand as an officer approached and took it out of his hand.[2] The weapon turned out not to be a knife, but a box cutter with two short blades at the end. Starting from the point at which Hernandez came out from behind the truck until he collapsed

---

[2] M.L.H.'s assertion that Hernandez was unarmed during the latter part of the incident is thus "blatantly contradicted" by the videotape. *Scott*, 550 U.S. at 380–81.

on the ground, the entire confrontation lasted no more than 20 seconds. All six shots were fired within eight seconds.

Hernandez died from his injuries. A forensic pathologist retained by Plaintiffs opined that McBride's sixth shot—which the pathologist concluded "more likely than not" struck Hernandez in the top of his head before ultimately lodging inside the tissues in his neck—caused "[t]he immediately fatal wound in [Hernandez's] death." The pathologist further concluded that "[t]he next most serious wound was the wound to [Hernandez's] right shoulder that involved the lung and liver," which he opined was "more likely than not" inflicted by McBride's fourth shot. However, he stated that the shoulder wound "would not . . . have produced immediate death" and that "[w]ith immediate expert treatment, this wound alone may have been survivable." In Defendants' response to Plaintiffs' oppositions to summary judgment, Defendants did not raise evidentiary objections to the forensic pathologist's report, nor did they provide any basis for rejecting its conclusions as a matter of law.

**B**

In May and June of 2020, Hernandez's parents (Manuel and Maria Hernandez) and his minor daughter (M.L.H.) (collectively, "Plaintiffs") filed separate § 1983 actions alleging constitutional violations in connection with the shooting death of Hernandez. Shortly thereafter, the district court formally consolidated the two cases for all purposes, and Plaintiffs filed a consolidated complaint against the City of Los Angeles ("the City"), the Los Angeles Police Department ("LAPD"), and McBride (collectively, "Defendants"). The operative consolidated complaint alleged three federal claims that remain at issue in this

appeal: (1) a Fourth Amendment excessive force claim brought against McBride by Plaintiffs, acting on behalf of Hernandez's Estate; (2) a Fourteenth Amendment claim for interference with familial relations brought by Plaintiffs on their own behalf against all Defendants; and (3) a claim under *Monell v. Department of Social Services of the City of N.Y.*, 436 U.S. 658 (1978), by Plaintiffs, on behalf of the Estate and themselves, against the City and LAPD. The complaint also asserted pendent state law claims for, *inter alia*, assault, wrongful death, and violation of the Bane Act (Cal. Civ. Code § 52.1).

In August 2021, the district court granted Defendants' motion for summary judgment on all claims. The court held that, as a matter of law, McBride did not use excessive force in violation of the Fourth Amendment but that, even if she did, she was entitled to qualified immunity. The court also held that McBride's actions did not "shock the conscience" and that the Fourteenth Amendment claim therefore lacked merit as a matter of law. The court concluded that the *Monell* claim failed both because there was no underlying constitutional violation and because, even if there were such a violation, Plaintiffs had not established any basis for holding the City and LAPD liable. Finally, the court held that, because all parties agreed that the remaining state law claims for assault, wrongful death, and violation of the Bane Act "r[o]se or f[e]ll based on the reasonableness of Officer McBride's use of force," summary judgment was warranted on these claims as well.

Plaintiffs timely appealed, and we have jurisdiction under 28 U.S.C. § 1291.

## II

We first address Plaintiffs' claim, asserted on behalf of Hernandez's Estate, that McBride used excessive force in violation of the Fourth Amendment.

### A

A police officer's application of deadly force to restrain a subject's movements "is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Tennessee v. Garner*, 471 U.S. 1, 7 (1985); *see Kisela v. Hughes*, 584 U.S. 100, 103–07 (2018) (applying Fourth Amendment standards to a police shooting of a suspect confronting another person with a knife). Accordingly, any such use of deadly force must be "objectively reasonable." *Graham v. O'Connor*, 490 U.S. 386, 397 (1989).

In evaluating whether a particular use of force against a person is objectively reasonable under the Fourth Amendment, "the trier of fact should consider all relevant circumstances," including, as applicable, "the following illustrative but non-exhaustive factors: 'the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.'" *Demarest v. City of Vallejo*, 44 F.4th 1209, 1225 (9th Cir. 2022) (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015)). The overall assessment of these competing factors must be undertaken with two key principles in mind. First, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Kisela*, 584

U.S. at 103 (citation omitted). Second, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* (citation omitted).

We first consider whether, under these standards, McBride "acted reasonably in using deadly force" at all. *Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014). We agree with the district court that, based on the undisputed facts, McBride's initial decision to fire her weapon at Hernandez was reasonable as a matter of law.

The "most important" consideration in assessing the reasonableness of using deadly force is "whether the suspect posed an 'immediate threat to the safety of the officers or others,'" *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc) (citations omitted), and here the undisputed facts establish that the "threat reasonably perceived by the officer," *Demarest*, 44 F.4th at 1225 (citation omitted), was substantial and imminent. At the time that McBride fired her first shot, Hernandez had ignored her instruction to "Stay right there!" and instead advanced towards her while holding a weapon that McBride had been told repeatedly was a knife. He did so while extending his arms out and yelling in McBride's direction, and, as he continued approaching her, he ignored four separate commands to drop the knife. Under these circumstances, use of deadly force to eliminate the objectively apparent threat that Hernandez imminently posed was reasonable as a matter of law. *See Hayes v. County of San Diego*, 736 F.3d 1223, 1234 (9th Cir. 2013) ("[T]hreatening an officer with a weapon does justify the use of deadly force."); *Smith v. City of Hemet*, 394 F.3d 689, 704 (9th Cir. 2005) (en banc) ("[W]here a suspect threatens an

officer with a weapon such as a gun or a knife, the officer is justified in using deadly force."). While Plaintiffs emphasize that Hernandez was still approximately 40 feet away from McBride when she fired, "[t]here is no rule that officers must wait until a [knife-wielding] suspect is literally within striking range, risking their own and others' lives, before resorting to deadly force." *Reich v. City of Elizabethtown*, 945 F.3d 968, 982 (6th Cir. 2019) (holding that shooting of approaching knife-wielding suspect within six feet was reasonable and that even shooting a knife-wielding suspect 36 feet away would not violate clearly established law).

We also conclude, however, that the evidence in this case would permit a reasonable trier of fact to find that McBride fired three temporally distinct volleys of two shots each. *See supra* at 7–9. Indeed, there is almost a two-second pause between McBride's second and third shots, and there is about a one-second pause between her fourth and fifth shots. Accordingly, even though McBride's first volley of shots was reasonable as a matter of law, we must still consider whether she "acted unreasonably in firing a total of [six] shots." *Plumhoff*, 572 U.S. at 777. On that score, *Plumhoff* holds that, "if police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended." *Id.* We have cautioned, though, that "terminating a *threat* doesn't necessarily mean terminating [a] *suspect*." *Zion v. County of Orange*, 874 F.3d 1072, 1076 (9th Cir. 2017) (emphasis added). Thus, if an initial volley of shots has succeeded in disabling the suspect and placing him "in a position where he could [not] easily harm anyone or flee," a "reasonable officer would reassess the situation rather than continue shooting." *Id.*

Applying these principles to this case, we agree with the district court that the undisputed video evidence confirms that, at the time McBride fired the second volley of shots, the "threat" that Hernandez posed had not yet "ended." *Plumhoff*, 572 U.S. at 777. Despite falling down after having been hit by two bullets, Hernandez immediately rolled over, pressed his hands against the ground, and began shifting his weight to his feet in order to stand up. All the while, he continued shouting, and he still held his weapon in his hand despite yet another instruction by McBride to drop it. McBride's third and fourth shots were thus reasonable as a matter of law.

However, McBride's final volley of shots—*i.e.*, shots five and six—present a much closer question. Immediately after the fourth shot, Hernandez was lying on his back with his legs in the air, pointing away from where McBride was. Hernandez then rolled over onto his left side such that his back was towards McBride. He was in that position—facing away from McBride and still lying on his side on the ground—when McBride fired her fifth shot. Although Hernandez was still moving at the time of that shot, he had not yet shown that he was in any position to get back up. Hernandez then continued to roll over, so that he was again facing McBride. As Hernandez, while still down on the ground, first appeared to shift his weight onto his left elbow, McBride fired her sixth shot. Under these circumstances, a reasonable trier of fact could find that, at the time McBride fired these two additional shots, the threat from Hernandez—who was still on the ground—had sufficiently been halted to warrant "reassess[ing] the situation rather than continu[ing] shooting." *Zion*, 874 F.3d at 1076. A reasonable jury could find that, at the time of the fifth and sixth shots, Hernandez "was no longer an immediate threat,

and that [McBride] should have held [her] fire unless and until [Hernandez] showed signs of danger or flight." *Id.* Alternatively, a reasonable "jury could find that the [third] round of bullets was justified." *Id.* On this record, the reasonableness of the fifth and sixth shots was thus a question for the trier of fact, and the district court erred in granting summary judgment on that issue.

**B**

McBride alternatively contends that, even if a reasonable jury could find excessive force, she is nonetheless entitled to qualified immunity. We agree.

"The doctrine of qualified immunity shields officers from civil liability so long as their conduct 'does not violate *clearly established* statutory or constitutional rights of which a reasonable person would have known.'" *City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (emphasis added)). In determining whether the applicable law is "clearly established," so as to defeat qualified immunity, the Supreme Court "has repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality." *Kisela*, 584 U.S. at 104 (citations and internal quotation marks omitted). Thus, "it does not suffice for a court simply to state that an officer may not use unreasonable and excessive force, deny qualified immunity, and then remit the case for a trial on the question of reasonableness." *Id.* at 105. Rather, the "law at the time of the conduct" must have defined the relevant constitutional "right's contours" in a manner that is "sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Id.* at 104–05 (citations omitted).

16      ESTATE OF HERNANDEZ V. CITY OF LOS ANGELES

This need for "[s]pecificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Kisela*, 584 U.S. at 104 (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (simplified)). Because "[u]se of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' . . . police officers are entitled to qualified immunity unless existing precedent '*squarely governs*' the specific facts at issue." *Id.* (emphasis added) (citation omitted). Here, there is no such pre-existing precedent that squarely governs the factual scenario presented here.

In arguing that McBride violated clearly established law, Plaintiffs place particular emphasis on this court's decision in *Zion*, 874 F.3d at 1075–76. That is understandable because, as our earlier analysis shows, the legal principles discussed in *Zion* help to elucidate why McBride's fifth and sixth shots could be unreasonable under Fourth Amendment standards. *See supra* at 13–15. But there is a difference between concluding that *Zion* supports Plaintiffs' position on the merits and concluding that *Zion* places the outcome of this case "beyond debate." *Kisela*, 584 U.S. at 104 (citation omitted). The Supreme Court has repeatedly emphasized that, in addressing whether a particular precedent meets that latter standard, we must take account of any material factual differences in that precedent that would preclude us from saying that it "'squarely governs' the specific facts at issue." *Id.* (citation omitted); *see also City of Tahlequah*, 595 U.S. at 13–14; *Brosseau v. Haugen*, 543 U.S. 194, 200–01 (2004); *Ventura v. Rutledge*, 978 F.3d 1088, 1092 (9th Cir. 2020). Examination of our decision in

*Zion* confirms that it differs in several critical respects from the instant case and that it therefore cannot be said to have clearly established the law that governs here.

In *Zion*, the officers were called to Zion's apartment complex after he had suffered several seizures and assaulted his mother and roommate with a knife. 874 F.3d at 1075. As the first officer arrived at the complex, "Zion ran at him and stabbed him in the arms." *Id.* A second arriving officer witnessed the stabbing and then shot at Zion nine times from about 15 feet away while Zion was running back towards the apartment complex. *Id.* After Zion fell to the ground, the second officer ran up to him and fired "nine more rounds at Zion's body from a distance of about four feet, emptying his weapon." *Id.* At that point, Zion "curl[ed] up on his side" but was "still moving." *Id.* After taking a pause and "walk[ing] in a circle," the officer then took "a running start and stomp[ed] on Zion's head three times." *Id.* "Zion died at the scene." *Id.* On appeal from a grant of summary judgment to the defendants, the plaintiff (Zion's mother) did not challenge the "initial nine-round volley," and instead only "challenge[d] the second volley (fired at close range while Zion was lying on the ground) and the head-stomping." *Id.* In concluding that there was a triable issue of excessive force, we emphasized that there were several disputed issues of fact that, if resolved in the plaintiff's favor, would warrant a finding that the second volley of shots was unreasonable. *Id.* at 1075–76. In particular, we held that a jury needed to resolve the parties' factual disputes as to whether "Zion was trying to get up"; "[w]hether the knife was still in Zion's hand or within his reach"; and "whether [the officer] thought Zion was still armed." *Id.* at 1076 & n.2.

This case differs from *Zion* as to each of these critical facts. The video evidence in this case clearly shows that, even after the fourth shot, Hernandez continuously moved in a way that gave the objective appearance of trying to get up; the video evidence shows that Hernandez never dropped his weapon and still had it in his hand at the end of the episode; and McBride's continued instructions to Hernandez to drop the knife confirm that she continued to believe that he was armed. Although we conclude that *Zion* is persuasive authority that supports a finding of unreasonableness here, the case is sufficiently and materially different on its facts that we cannot say that it "'squarely govern[ed]' the specific facts" of this case or placed that outcome "beyond debate." *Kisela*, 584 U.S. at 104 (citations omitted).

Plaintiffs also rely on *Deorle v. Rutherford*, 272 F.3d 1272, 1280 (9th Cir. 2001), but the Supreme Court "has already instructed the Court of Appeals not to read its decision in that case too broadly in deciding whether a new set of facts is governed by clearly established law." *Kisela*, 584 U.S. at 106. The Court's summary of *Deorle* in *Kisela* equally confirms why it does not squarely govern the facts of this case: "*Deorle* involved a police officer who shot an unarmed man in the face, without warning, even though the officer had a clear line of retreat; there were no bystanders nearby; the man had been 'physically compliant and generally followed all the officers' instructions'; and he had been under police observation for roughly 40 minutes." *Id.* at 106–07 (citing *Deorle*, 272 F.3d at 1276, 1281–82). Nearly all of these key factual premises underlying *Deorle*'s holding are missing in this case.

The other Ninth Circuit cases on which Plaintiffs rely are even more strikingly distinguishable from this case. Indeed, in addition to other significant differences, none of the cited

cases even involves a situation (such as this one or *Zion*) in which the use of deadly force initially *was* reasonable. *See Nehad v. Browder*, 929 F.3d 1125, 1141 (9th Cir. 2019) (holding that the officer's shooting of a suspect reported to have earlier threatened someone with a knife was unreasonable under clearly established law where a jury could find that the officer "responded to a misdemeanor call, pulled his car into a well-lit alley with his high beam headlights shining into [the suspect's] face, never identified himself as a police officer, gave no commands or warnings, and then shot [the suspect] within a matter of seconds, even though [the suspect] was unarmed, had not said anything, was not threatening anyone, and posed little to no danger to [the officer] or anyone else"); *Hayes*, 736 F.3d at 1235 (holding that immediate shooting of suicidal man who revealed a knife, without ordering him to stop or drop the knife, was unreasonable).

Plaintiffs argue that, even apart from its specific facts, *Zion* clearly establishes the broader proposition that "the use of deadly force against a non-threatening suspect is unreasonable." *Zion*, 874 F.3d at 1076. But this overbroad reading of *Zion* is directly contrary to *Kisela*, which squarely held that we may not define "clearly established" law in the excessive force context at this "high level of generality." *Kisela*, 584 U.S. at 104 (citation omitted). Indeed, *Zion* noted that the "boundary" line is "murky" when it comes to defining exactly when the permissible use of deadly force against a suspect who "poses an immediate threat" must be *halted* on the ground that "the suspect no longer poses a threat." *Zion*, 874 F.3d at 1075. Given that *Zion* itself noted that the relevant line is "murky," it can hardly be said to have *clearly* established a general rule that places the outcome of this case beyond debate.

We acknowledge that, even when, as here, there is no relevant "[p]recedent involving similar facts" that "can help move a case beyond the otherwise 'hazy border between excessive and acceptable force,'" generally framed rules can still "create clearly established law" in "an 'obvious case.'" *Kisela*, 584 U.S. at 105 (citation omitted). But to meet that high standard, Plaintiffs would have to show that "*any* reasonable official in the defendant's shoes would have understood that he was violating" the Constitution. *Id.* (quoting *Plumhoff*, 572 U.S. at 778–79 (emphasis added)). That demanding standard reflects the long-standing principle that "qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix*, 577 U.S. at 12 (citation omitted). Plaintiffs have not satisfied that standard here. As our earlier discussion of the merits of this case makes clear, this is not an obvious case, but rather a close and difficult one. Thus, even granting that McBride's fifth and sixth shots may have been unreasonable, this is not an obvious situation in which *every* reasonable officer would have understood that the law forbade firing additional shots at the already wounded Hernandez as he plainly appeared to continue to try to get up.

Because McBride did not violate clearly established law in firing her third volley of shots, we conclude that she is entitled to qualified immunity. On that basis, we affirm the grant of summary judgment to McBride on Plaintiffs' Fourth Amendment excessive force claim.

## III

We next address Plaintiffs' challenge to the district court's dismissal of their Fourteenth Amendment claim against all Defendants.

ESTATE OF HERNANDEZ V. CITY OF LOS ANGELES        21

We have held that "parents have a Fourteenth Amendment liberty interest in the companionship and society of their children" and that "[o]fficial conduct that 'shocks the conscience' in depriving parents of that interest is cognizable as a violation of due process." *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010) (citation omitted). We have extended this reasoning to also cover the converse situation of "a 'child's interest in her relationship with a parent.'" *Ochoa v. City of Mesa*, 26 F.4th 1050, 1056 (9th Cir. 2022) (quoting, *inter alia*, *Smith v. City of Fontana*, 818 F.2d 1411, 1418 (9th Cir. 1987), *overruled on other grounds by Hodgers-Durgin v. De la Viña*, 199 F.3d 1037, 1040 n.1 (9th Cir. 1999) (en banc)). In describing the sort of conduct that would qualify as "shock[ing] the conscience" under this line of cases, we have drawn a distinction between cases where "actual deliberation is practical" and those in which it is not. *Zion*, 874 F.3d at 1077 (citation omitted). In the former situation, liability may be established by showing that the officer acted with "deliberate indifference." *Id.* (citation omitted). But where deliberation is impractical, we require a showing that the officer "acted with 'a purpose to harm without regard to legitimate law enforcement objectives.'" *Id.* (citation omitted).

The outcome of this case, under these standards, is dictated by our decision in *Zion*. In that case, we held that the "two volleys [of shots] came in rapid succession, without time for reflection" and that the more demanding liability standard therefore applied. *Zion*, 874 F.3d at 1077. Given that the two volleys in *Zion* occurred six seconds apart, *see id.* at 1075, the one-second gap between McBride's second and third volleys likewise constitutes, under *Zion*, insufficient time to reflect. Plaintiffs therefore must show that McBride "acted with 'a purpose to harm without regard

to legitimate law enforcement objectives.'" *Id.* at 1077 (citation omitted).

Plaintiffs wholly failed to raise a triable issue under this standard. Here, as in *Zion*, "[w]hether excessive or not, the shootings served the legitimate purpose of stopping a dangerous suspect." *Zion*, 874 F.3d at 1077; *see also Nehad*, 929 F.3d at 1134, 1139 (holding that, although there was a triable issue as to whether officer used excessive force in firing on a knife-wielding suspect who "didn't make any offensive motions" and "was actually not a lethal threat" to the officer, the plaintiffs' Fourteenth Amendment claim nonetheless failed because there was "no evidence that [the officer] fired on [the decedent] for any purpose other than self-defense, notwithstanding the evidence that the use of force was unreasonable").[3]

Because there was no Fourteenth Amendment violation, the district court correctly granted summary judgment to all Defendants on this claim.

## IV

As noted earlier, the district court dismissed Plaintiffs' *Monell* claim against the City and LAPD, concluding that (1) there could be no municipal liability when there was no underlying constitutional violation; and (2) even if there was such a violation, Plaintiffs had failed to provide any basis for holding the City and LAPD liable for McBride's shooting of Hernandez. The district court's first rationale fails in light of our conclusion that there is a triable issue as to whether

---

[3] To the extent that M.L.H. contends that she was not provided a sufficient opportunity to conduct additional discovery with respect to her claims, including her Fourteenth Amendment claim, we reject that argument for reasons explained below. *See infra* section IV.

McBride's final volley of shots was excessive under the applicable Fourth Amendment standards. We nonetheless agree with the district court's second rationale, and on that basis, we affirm the grant of summary judgment to the City and LAPD on the *Monell* claim.

As to Hernandez's parents and Estate, the district court noted that their summary judgment "opposition [was] almost entirely silent as to municipal liability" and merely argued that LAPD was properly named as an *additional* municipal Defendant with the City. The same is true of their opening brief in this court. Even assuming *arguendo* that Hernandez's parents and Estate have not thereby completely forfeited their *Monell* claim, they have failed to provide any basis for reversal beyond what is stated by their co-Plaintiff (M.L.H.) in the latter's opening brief.

For her part, M.L.H. does not contest the district court's determination that, based on the existing summary judgment record, there was insufficient evidence to establish municipal liability under *Monell*. Instead, M.L.H. seeks reversal of the dismissal of the *Monell* claim solely on the ground that the district court assertedly abused its discretion in refusing to extend the discovery cut-off deadline established under the court's scheduling order issued under Federal Rule of Civil Procedure 16(b). We reject this contention.

In requesting a modification of the discovery schedule set forth in a Rule 16(b) scheduling order, a party must make a showing of "good cause." FED. R. CIV. P. 16(b)(4). As we have explained, "[t]he good cause standard of Rule 16(b) 'primarily considers the diligence of the party seeking'" the modification, and "[i]f that party was not diligent, the inquiry should end." *Branch Banking & Tr. Co., v. D.M.S.I.,*

*LLC*, 871 F.3d 751, 764 (9th Cir. 2017) (citation omitted). The district court did not abuse its discretion in concluding that M.L.H. had failed to show diligence in pursuing discovery.

As the court noted, M.L.H. did not serve any formal discovery for almost six months, and she "waited until the very end of discovery to notice depositions that she knew she wanted to take at the outset of the case." By proceeding in this fashion, the court concluded, M.L.H. "left herself no margin for error." On appeal, M.L.H. contends that the discovery deadline should have been extended in light of the asserted inadequacy of Defendants' responses to the discovery propounded by the *other* separately represented Plaintiffs (*i.e.*, Hernandez's parents and Estate). But as M.L.H. herself notes, *M.L.H.* "could not immediately act" to address those deficiencies "by way of a motion to compel because *she was not the party who propounded the requests*" (emphasis added). By failing to take *any* steps to serve her own formal discovery requests for six months, M.L.H. unnecessarily placed herself in a position in which she was unable to bring discovery motions until fairly late in the process, and thus needed to conduct a range of discovery at the eleventh hour. M.L.H. also argues that the failure to serve discovery during the six-month period from August 2020 until February 2021 should have been excused in light of the Covid pandemic, but that explanation does not justify a complete failure to serve even *written* discovery before February 2021. Although the district court's ruling may have been harsh, we cannot say that the court abused its discretion in concluding that M.L.H. had not shown sufficient diligence and that an extension of the discovery cut-off was unwarranted.

Because Plaintiffs have provided no other basis for concluding that the *Monell* claim should not have been dismissed, we affirm the district court's grant of summary judgment on that claim.

## V

Finally, we turn to Plaintiffs' state-law claims for (1) assault, (2) wrongful death, and (3) violation of California Civil Code § 52.1. The district court's sole reason for granting summary judgment to Defendants on these claims was its "determinat[ion] that Officer McBride's use of force was reasonable." Because we conclude that the reasonableness of McBride's final volley of shots presents a question for a trier of fact, the district court erred in dismissing these state law claims on that ground. We therefore reverse the district court's dismissal of these claims.

## VI

For the reasons we have stated, we affirm the district court's grant of summary judgment to Defendants on all of Plaintiffs' federal claims, and we reverse the district court's summary judgment with respect to Plaintiffs' state law claims for assault, wrongful death, and violation of the Bane Act (Cal. Civ. Code § 52.1).

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

9th Circuit Case Number: 21-55994

CERTIFICATE OF SERVICE

I hereby certify that I electronically filed Appellants' Brief Re: Rehearing En Banc with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on May 8, 2024.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


Signature:    /s Gerald P. Peters