No. 21-55994, No. 21-55995

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

ESTATE OF DANIEL HERNANDEZ; et al.,

Plaintiffs-Appellants,

v.

CITY OF LOS ANGELES; et al.,
Defendants-Appellees

---

On Appeal from the United States District Court,
Central District of California,
No. 20-cv-0477-SB-KS/No. 20-cv-05154-DMG-KS
Hon. Stanley Blumenfeld, Jr.

---

## APPELLEES' BRIEF REGARDING REHEARING EN BANC

---

Kevin E. Gilbert, Esq. (SBN: 209236)
Carolyn Aguilar, Esq. (SBN: 289550)
ORBACH HUFF & HENDERSON
6200 Stoneridge Mall Road, Suite 225
Pleasanton, CA  94588
Telephone: (510) 999-7908
Email: kgilbert@ohhlegal.com
          caguilar@ohhlegal.com

Colleen R. Smith, Esq. (SBN: 209719)
Deputy City Attorney
200 North Main Street, 6th Floor
City Hall East
Los Angeles, CA 90012
Telephone: (213) 978-7027
Email: colleen.smith@lacity.org

Attorneys for Defendants-Appellees CITY OF LOS ANGELES, LOS ANGELES
POLICE DEPARTMENT and TONI McBRIDE

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ........................................................................5

II.    RELEVANT FACTUAL BACKGROUND ....................................7

     A.    The Subject Incident.........................................................7

     B.    The Panel Decision..........................................................11

III.    ARGUMENT...............................................................................14

     A.    The Opinion Conflicts with *Plumhoff* and Subsequent Ninth Circuit Precedent ...............................................................14

     B.    The Opinion Conflicts with *Graham* ...................................18

IV.    CONCLUSION...........................................................................23

Form 11. Certificate of Compliance for Petitions for Rehearing/Responses ..........24

# TABLE OF AUTHORITIES

**Page(s)**

**F**EDERAL **C**ASES

*City & Cnty of S.F. v. Sheehan*,
    575 U.S. 600 (2015) ................................................................*passim*

*George v. Morris*,
    736 F.3d 829 (9th Cir. 2013)..........................................................20

*Gonzales v. City of Antioch*,
    697 F. App'x 900 (9th Cir. 2017) ..................................................20

*Graham v. Connor*,
    490 U.S. 386 (1989) ................................................................*passim*

*Hart v. City of Redwood City*,
    99 F.4th 543 (9th Cir. April 19, 2024) .............................................6

*Heien v. North Carolina*,
    574 U.S. 54 (2014) ........................................................................21

*Monzon v. City of Murrieta*,
    978 F.3d 1150 (9th Cir. 2020)..................................................15, 20

*O'Doan v. Sanford*,
    991 F.3d 1027 (9th Cir. 2021)........................................................19

*Plumhoff v. Rickard*,
    572 U.S. 765 (2014) ................................................................*passim*

*Sheehan v. City & Cnty of San Francisco*,
    743 F.3d 1211 (9th Cir. 2014).......................................................15

*Smith v. Agdeppa*,
    81 F.4th 994 (9th Cir. 2023)..........................................................20

# TABLE OF AUTHORITIES

**Page(s)**

*Wilkinson v. Torres*,
    610 F.3d 546 (9th Cir. 2010)............................................................15

*Zion v. County of Orange*,
    874 F.3d 1072 (9th Cir. 2017)..................................................*passim*

## STATE CASES

*Brown v. Ransweiler*,
    171 Cal.App.4th 516 (2009)............................................................22

## I.    INTRODUCTION

While the Court's Opinion properly granted Officer Toni McBride ("McBride") qualified immunity, it reached an erroneous conclusion as to the reasonableness of her last two shots (shots five and six), finding that their reasonableness constituted a question for the trier of fact.  That determination was reached despite acknowledging that the six shots were fired in approximately six seconds, and that the "video evidence . . . ***clearly shows that, even after the fourth shot, Hernandez continuously moved in a way that gave the objective appearance of trying to get up***; the video evidence shows that Hernandez never dropped his weapon and still had it in his hand at the end of the episode; and McBride's continued instruction to Hernandez to drop the knife confirm that she continued to believe that he was armed."  Opinion at 18.

The Opinion conflicts with Supreme Court and Ninth Circuit precedent, including *Plumhoff v. Rickard*, 572 U.S. 765 (2014) ("*Plumhoff*") where the High Court concluded that "if lethal force is justified, officers are taught to keep shooting until the threat is over," and "need not stop shooting until the threat has ended."  *Plumhoff*, 572 U.S. at 777.  Generally, cases have held that when volleys of shots are fired in temporal proximity, any significance of disparate volleys is illusory; by artificially dissecting one continuous threat into individual and separate inquires (as this Court did), the Court engaged in improper hindsight

analysis, in conflict with *Graham v. Connor*, 490 U.S. 386 (1989) ("*Graham*") and their progeny.  Supreme Court precedent makes clear that an officer is not required to cease firing in response to an immediate threat unless the suspect has been "clearly incapacitated."  *Plumhoff*, 572 U.S. at 777.  The Opinion's finding that "Hernandez continuously moved in a way that gave the objective appearance of trying to get up" (Opinion at 18) forecloses any argument that Daniel Hernandez ("Hernandez") had been "clearly incapacitated" when the final two shots were fired.  Thus, the only conclusion that can be reached which is in harmony with *Graham*, *Plumhoff* and the multitude of other cases is that McBride's final two shots were reasonable and did not violate the Fourth Amendment.

McBride had a split second between the first four shots (deemed to be reasonable) and the final two shots to make a judgment call of whether Hernandez remained an imminent threat and was continuing his advance.  Very recently, this Court confirmed that in a factually similar matter, a non-compliant individual armed with a knife and attempting to advance "unarguably" posed an immediate threat, which justified the use of lethal force.  *Hart v. City of Redwood City*, 99 F.4th 543, 550, 552 (9th Cir. April 19, 2024).  Yet the Opinion here reached a contrary conclusion.

Unarguably, McBride's last two shots were objectively reasonable, especially where the Opinion concedes that Hernandez was still advancing. Indeed, all of McBride's shots were fired in approximately six seconds. No other case has ever found an officer's split-second pause in the midst of defending against an immediate threat to be justified one second, but unjustified only a fraction of a second later. If this Court were to let the current Opinion stand, this Court would directly contradict the Supreme Court's findings and dictates in *Graham*, *Plumhoff*, and *City & Cnty of S.F. v. Sheehan,* 575 U.S. 600, 613 (2015) ("*Sheehan*"). Accordingly, rehearing is warranted.

## II. RELEVANT FACTUAL BACKGROUND

### A. The Subject Incident

The incident in question occurred late in the afternoon of April 22, 2020. 8-ER-1816, ¶ 22. Hernandez was high on methamphetamine while speeding down San Pedro Street toward the intersection of 32nd Street in Los Angeles through a downtown business district at over 70 miles-per-hour when he ran into a vehicle waiting to make a left-hand turn. Id.; 4-ER-0768, ¶ 7; 4-ER-0833-34. While holding the accelerator to the floor, Hernandez smashed into a small vehicle, rendering it almost unrecognizable and propelling it across the intersection. See,

4-ER-0840-45; 4-ER-0854 at 01:52-59[1]; 4-ER-0856 at 1:08-15. After crashing

into other vehicles, Hernandez's truck finally came to rest approximately fifty

yards away, when it struck a parked motorhome. Id. Hernandez's initial crash

caused severe injuries to several individuals, all of whom required emergency

medical care. 2-ER-164 at 0:00-1:24.

Once Hernandez's truck came to a stop, bystanders called 9-1-1 reporting

Hernandez's threatening behavior and requesting emergency aid. 8-ER-1816, ¶

22; 4-ER-0856 at 01:16-25 ("…San Pedro and 32nd is now an ADW (assault with

a deadly weapon) suspect there now…. The suspect is male, armed with a

knife…"). McBride and her partner, Officer Fuchigami, were enroute to another

incident when they observed the accident scene and stopped to assist. 2-ER-216,

¶¶ 1-2; 3-ER-322, ¶¶ 1-2; 4-ER-849, ¶ 2.

As McBride exited her vehicle, she observed approximately 50 people in the

vicinity, with some pointing to Hernandez's vehicle and stating there was a "crazy

guy with a knife" in the truck that was threatening bystanders and attempting to

harm himself. 4-ER-0856, 01:16-32; 4-ER-0854, 01:51-56; 2-ER-165, 0:22-29.

McBride observed an individual in the truck (later identified as Hernandez) and

began directing bystanders to clear out of the area. Id.; 4-ER-850, ¶ 7. While

---

[1] All references to the video evidence refer to the elapsed time from the start of the
video and not to the time stamps indicated in the videos.

monitoring the truck, McBride observed Hernandez climb out of the driver's side window.  4-ER-850, ¶ 8; 4-ER-856, 0:02:23-02:25.  Based upon the numerous reports of Hernandez being armed and threatening both himself and bystanders, McBride called to Hernandez, stating "Hey man, let me see your hands.  Let me see your hands, man."  4-ER-850, ¶ 9; 4-ER-854, 0:02:48-02:54.

Moments later, Hernandez appeared from behind the truck and advanced towards McBride with knife in hand.  4-ER-850, ¶ 10; 4-ER-854, 02:54-02:55; 4-ER-856, 0:02:29-0:02:32; 4-ER-838, 0:00:05-0:00:11.  As Hernandez quickly closed the distance, McBride ordered him to "Stay right there.  Drop the knife."  4-ER-850, ¶ 10; 4-ER-854, 0:02:55-02:57; 4-ER-856, 0:02:35-0:02:36.  While giving those commands, McBride simultaneously gestured with her left hand for Hernandez to stop.  4-ER-850, ¶ 10; 4-ER-854, 0:02:55-02:57; 4-ER-856, 0:02:35-0:02:36.  Unfortunately, Hernandez refused to comply and instead continued to advance while clutching a knife.  4-ER-850, ¶ 10; 4-ER-854, 02:57-02:58; 4-ER-856, 0:02:36-0:02:37; 4-ER-838, 0:00:11-0:00:16.  In response, McBride began backing up while again directing Hernandez to "Drop the knife!  Drop the knife!"  4-ER-850, ¶ 11; 4-ER-854, 02:58-03:01; 4-ER-856, 0:02:36-0:02:37.

Notably, McBride believed Hernandez was under the influence of drugs.  4-ER-850-851, ¶ 12; 4-ER-833-844.  That belief was based upon her observations of Hernandez being significantly agitated, shirtless, sweating profusely, acting jittery,

refusing to comply with her directives while also displaying an overly aggressive behavior. Id. As Hernandez advanced (still with a knife in his right hand), McBride's concern for her own, her partner and the crowd's safety escalated. In response to further orders to "drop the knife," Hernandez finally responded, threatening that "I'm not going to drop this knife." 4-ER-851, ¶ 14.

After Hernandez advanced further towards McBride with knife in hand, she raised her weapon from the low-ready position and pointed it at Hernandez, again yelling "Drop it!" 4-ER-854, 02:58-03:02; 4-ER-856, 0:02:36-0:02:37; 4-ER-838, 0:00:11-0:00:16; 4-ER-847; 4-ER-851, ¶ 16. When Hernandez refused to comply and as he progressed even closer to both McBride and bystanders, McBride feared that Hernandez posed an imminent threat. 4-ER-852, ¶ 23. In response, she fired two rounds at Hernandez. 4-ER-851, ¶ 17; 4-ER-854, 03:02-03:04; 4-ER-856, 0:02:38-0:02:40; 4-ER-838, 0:00:16-0:00:17. Although he initially fell to the ground, Hernandez immediately transitioned into a crouched position while screaming in rage. 4-ER-851, ¶ 17; 4-ER-854, 03:04-03:05; 4-ER-856, 0:02:40-0:02:41; 4-ER-838, 0:00:19.

McBride again yelled to Hernandez, directing him to "drop it." 4-ER-851, ¶ 18; 4-ER-854, 3:05. Unfortunately, Hernandez again refused, instead raising himself into what appeared to be a sprinter's stance in an apparent effort to continue towards McBride. 4-ER-851, ¶ 17; 4-ER-854, 03:04-03:05; 4-ER-856,

0:02:40-0:02:41; 4-ER-838, 0:00:19. McBride then fired a third and fourth round at Hernandez (4-ER-851, ¶ 19; 4-ER-854, 3:05-3:07; 4-ER-856, 0:02:41-0:02:42; 4-ER-838, 0:00:20-0:00:21), who fell onto his back before rotating onto his side while appearing to again get up and continue his advance on her, still tightly grasping the knife. 4-ER-851, ¶ 19; 4-ER-854, 3:07-3:08; 4-ER-856, 0:02:42-0:02:44; 4-ER-838, 0:00:22. As Hernandez continued to roll, McBride fired her final fifth and sixth shots, with Hernandez falling and finally remaining on the ground. 4-ER-852, ¶ 20; 4-ER-854, 3:08-3:09; 4-ER-856, 0:02:44-0:02:45; 4-ER-838, 0:00:23. The six shots were fired within 6.18 seconds, with one second between the fourth and fifth shots. Id.

As the officers approached Hernandez to place him in handcuffs, they observed the knife still in his hand. 4-ER-852, ¶ 22; 4-ER-0854, 04:55-05:01. Although paramedics arrived shortly thereafter, Hernandez was pronounced dead at the scene.

## B. The Panel Decision

On August 10, 2021, the district court granted Defendants' motion for summary judgment, holding that, as a matter of law, McBride did not use excessive force but even if she did, she was entitled to qualified immunity. Opinion at 10.

On March 21, 2024, this Court agreed that McBride was entitled to qualified immunity, barring all of Plaintiffs' federal claims. Opinion at 15-20. However, the Court found that whether McBride's fifth and sixth shots constituted excessive force were questions of fact and reversed summary judgment, remanding the remaining state law claims. Id. at 14-15.

In making its finding that McBride's last two shots may have been excessive, the Court stated that although the first four shots were justified given the imminent threat that Hernandez posed, "McBride's final volley of shots – i.e. shots five and six – present a much closer question." Opinion at 14. In particular, the Court appears to have relied upon the cautionary comments from *Zion* in that "terminating a *threat* doesn't necessarily mean terminating [a] *suspect*." Opinion at 13, quoting *Zion v. County of Orange,* 874 F.3d 1072, 1076 (9th Cir. 2017) ("*Zion*") (emphasis in Opinion).

Presumably, with the authority from *Zion* in mind and despite acknowledging that "there is about a one-second pause between her fourth and fifth shots" (Opinion at 13), the Court found that, based on a hindsight review of the video, Hernandez appeared to be on the ground during those last two shots, where "a reasonable trier of fact could find that . . . the threat from Hernandez . . . had sufficiently halted to warrant 'reassess[ing] the situation rather than continu[ing] shooting.' . . . 'and that [McBride] should have held [her] fire unless

and until [Hernandez] showed signs of danger or flight.'" Opinion at 14-15, citing *Zion*, 874 F.3d at 1076. Although the Court referenced *Zion,* it did not compare McBride's actions or find similarities with the officer in *Zion* or in any other case which concluded that the officer's actions were deemed unreasonable.

On the contrary, the Court held that the facts in *Zion* were distinguishable from the facts of this case, such that McBride was entitled to qualified immunity. In particular, this Court found that the "video evidence . . . ***clearly shows that, even after the fourth shot, Hernandez continuously moved in a way that gave the objective appearance of trying to get up***; the video evidence shows that Hernandez never dropped his weapon and still had it in his hand at the end of the episode; and McBride's continued instruction to Hernandez to drop the knife confirm that she continued to believe that he was armed." Opinion at 18 (emphasis added). As the video "clearly shows" that "Hernandez continuously moved in a way that gave the *objective* appearance of trying to get up," under the existing legal precedent McBride's last two shots cannot be deemed *unreasonable.* This Court's holding that they could be deemed unreasonable directly conflicts with established Supreme Court precedent in *Plumhoff, Graham* and their progeny.

### III.  ARGUMENT

### A.  The Opinion Conflicts with *Plumhoff* and Subsequent Ninth Circuit Precedent

The Opinion is in direct conflict with current precedent, including most notably the Supreme Court's holding in *Plumhoff* and recent Ninth Circuit precedent interpreting *Plumhoff.*  In *Plumhoff,* the High Court held that "if lethal force is justified, officers are taught to keep shooting until the threat is over," and "need not stop shooting until the threat has ended."  *Plumhoff*, 572 U.S. at 777.  While the Opinion cited this authority, the facts and conclusions confirmed by the Supreme Court in *Plumhoff* appear to have been circumvented.

In *Plumhoff,* after engaging with the subject in a high-speed chase, officers fired into his moving vehicle, firing fifteen shots in two volleys within a ten-second span; the first volley consisted of approximately three shots, followed by a second volley (by other officers) of twelve shots, for a total of fifteen shots.  *Plumhoff*, 572 U.S. at 769-770, 777.  The Court found that "[u]nder the circumstances at the moment when the shots were fired, all that a reasonable police officer could have concluded was that Rickard was intent on resuming his flight and that, if he was allowed to do so, he would once again pose a deadly threat for others on the road."  *Id.*

The Ninth Circuit has interpreted *Plumhoff* as holding that when volleys of shots are fired in close temporal proximity, they should be considered together, and should not be separately analyzed. *Monzon v. City of Murrieta,* 978 F.3d 1150, 1159, n.8 (9th Cir. 2020) ("*Monzon*"); see also, *Wilkinson v. Torres*, 610 F.3d 546, 549-551 (9th Cir. 2010) (officer "did not violate a constitutional right" where he fired eleven rounds in less than nine seconds at a driver in a moving minivan backing up in the direction of another officer); *Sheehan v. City & Cnty of San Francisco*, 743 F.3d 1211, 1216, 1230 (9th Cir. 2014), reversed on other grounds in *City & Cnty of S.F. v. Sheehan,* 575 U.S. 600, 613 (2015) ("Even if [the officer] continued to fire after [the subject] reached the ground, it is clear from the very brief time that elapsed that [the officer] made a split-second judgment in responding to an imminent threat and fired a fusillade in an emergency situation." Internal quotations and citation omitted.).

This established precedent demonstrates that when the shots fired are temporally related to each other in a very short amount of time, the officer is not required to justify each shot fired on its own, so long as a suspect has not previously been "clearly incapacitated." *Plumhoff*, 572 U.S. at 777. Here, McBride fired all of her shots within six seconds, less than either of the shot-spans that were found reasonable in *Plumhoff* or *Wilkinson*. Additionally, the subject's actions here were similar to that in *Sheehan*; both subjects were on the ground and

continued to retain a sharp object when shots were fired. Like the officer in *Sheehan*, McBride was addressing a very fluid and dangerous situation within a span of six seconds; the shots fired were, in reality, one continuous response to the imminent threat that Hernandez posed.

When examining the undisputed facts in this matter in light of applicable precedent, the panel's reliance on *Zion* appears misplaced. In *Zion*, officers were called to the scene where a man (Zion) was acting irrationally after experiencing a seizure and who had reportedly cut his mother and a roommate with a knife. *Zion, 874 F.3d at 1075*. After the first officer was attacked and stabbed by Zion immediately upon exiting his vehicle, a second officer fired a volley of nine shots from approximately fifteen feet away, causing Zion to fall to the ground. *Id.* The officer then ran toward Zion and while only four feet away, the officer fired another nine rounds at Zion who did not appear to be getting up. *Id.* In contrast to this case, the second volley was six seconds after the initial shots *and significantly closer to the subject* than in the first volley. *Id.* There are no facts in the *Zion* opinion to suggest that Zion took any action or continued to be an immediate threat, after the first nine shots were fired. In fact, the videos confirmed that "Zion show[ed] no signs of getting up." *Zion, 874 F.3d at 1076*.

The facts of this matter – and Hernandez's continued efforts to advance – are markedly different to those in *Zion*. In McBride's case, she was never as close, nor

did she have six seconds for reflection, as did the officer in *Zion*.  In fact, the Plaintiffs alleged McBride was 44 feet from Hernandez.  2-ER-202, ¶ 23.  There was at most a one-second pause between McBride's fourth and fifth shots, which is drastically different from the six-second pause that was found unreasonable in *Zion*.  4-ER-854, 3:07-3:09; 4-ER-856, 0:02:43-0:02:45.  Unlike the officer in Zion, in this rapidly unfolding and potentially life-threatening encounter, McBride did not have the ability to reflect for six seconds between her shots.  She only had a split second to evaluate Hernandez's threatening behavior.

Though the Court in *Plumhoff* stated that its analysis would be "different . . . if [the officers] had initiated a second round of shots after an initial round had *clearly* incapacitated Rickard and had ended any threat of continued flight, or if Rickard had *clearly* given himself up" (*Plumhoff*, 572 U.S. at 777, emphasis added), the evidence does not demonstrate that Hernandez was *clearly* down and incapacitated in the split-second before McBride fired her last two shots.

In fact, the panel found to the contrary.  Opinion at 18 ("The video evidence in this case *clearly* shows that, even after the fourth shot, Hernandez continuously moved in a way that gave the *objective appearance* of trying to get up; the video evidence shows that *Hernandez never dropped his weapon* and still had it in his hand at the end of the episode; and *McBride's continued instructions to Hernandez to drop the knife confirm that she continued to believe that he was armed*."

Emphasis added.).  Indeed, McBride testified that although she consistently reassessed as each shot was fired, she continued to believe that Hernandez constituted a threat when each shot was fired.  4-ER-852, ¶¶ 19-23.

However, it appears that the panel may not have considered the factual nuances between *Zion* and *Plumhoff,* as explained above*,* which demonstrates that the facts in *Plumhoff* – i.e., a man who constituted a continuous threat – is more analogous to the facts McBride faced as opposed to those in *Zion,* in which a man did not constitute a continuous threat.  In fact, in finding McBride's actions could be found unreasonable, the Court made no analogies whatsoever.  Thus, its decision on whether her actions were objectively reasonable is not only inconsistent with existing precedent, but internally inconsistent as well, in that its decision in the qualified immunity analysis – where it called the video "clear" and cited facts that were unquestionable in supporting the reasonableness of McBride's actions – contradicts its earlier conclusions.

## B.      The Opinion Conflicts with *Graham*

The Opinion also conflicts with the Supreme Court's guidance from *Graham*, which reminds courts that "[t]he reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight" and that "[t]he calculus of

reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97; see also, *O'Doan v. Sanford,* 991 F.3d 1027, 1036 (9th Cir. 2021) ("Our task, however, is not to serve as a police oversight board or to second-guess officers' real-time decision from the standpoint of perfect hindsight.").

In McBride's case, there is at most a one-second pause between the fourth shot and the fifth shot. 4-ER-0854 3:07-3:09. That "split-second" can hardly be said to have suddenly changed the circumstances so drastically that where Hernandez was once was an imminent threat – a split-second later he was not. And even if there were facts to suggest Hernandez had been "clearly incapacitated," any evaluation must still account and allow for the split-second delay between a change in circumstances (had there been one) and an officer's perception and reaction thereto. *Graham*, 490 U.S. at 396. In finding otherwise, it appears that the Court may be overly scrutinizing McBride's split-second decision with the "20/20 vision of hindsight." As lawyers and judges are free to replay, pause, slow down, and stop videos of this incident repeatedly, McBride was not afforded that opportunity. She was instead forced to face this challenge in real-

time and to make a split-second judgment of whether Hernandez was and continued to pose an immediate threat. As *Graham* and decades of precedent dictate: it is improper for courts to second-guess an officer's real time assessment of an on-going emergency with the perfect vantage of hindsight. *Smith v. Agdeppa*, 81 F.4th 994, 1002 (9th Cir. 2023) ("[W]e do not "second-guess officers' real-time decisions from the standpoint of perfect hindsight."); *Monzon*, 978 F.3d at 1157. Yet, that is precisely what the Opinion does – literally splitting hairs (or, more accurately, tenths of a second).

With the dictates from *Plumhoff* and *Graham* in mind, courts have found that there generally must be objective evidence that the *officer* recognized the threat had ended in order to establish that a later use of force was unlawful. See, *Gonzales v. City of Antioch*, 697 F. App'x 900, 902 (9th Cir. 2017) ("Finally, the number of shots fired does not create a factual dispute to defeat summary judgment ... Although the officers fired 50 to 52 shots at [the decedent], appellants do not present any evidence suggesting the officers continued to fire at [the decedent] after *they knew he was incapacitated* or no longer posed a threat.") (emphasis added); see also, *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013) ("If the person is armed—or reasonably suspected of being armed—a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat.").

Here, there is no objective evidence that McBride recognized that the immediate threat posed by Hernandez had ended in the "split second" between her fourth and fifth shots. As this Court concluded, Hernandez looked like he was continuing to get up and advance after the fourth shot was fired, confirming that he continued to pose an immediate threat. Opinion at 18. There is also no question that Hernandez retained the knife (boxcutter) in hand after all the shots had been fired. 4-ER-852, ¶ 22; 4-ER-0854, 04:55-05:01. Thus, there is no evidence to support that McBride believed or should have known that the threat had ended. In fact, the evidence is to the contrary. See, 4-ER-852, ¶¶ 19-23.

Notably, the Constitution is not violated simply because an officer makes a reasonable but mistaken judgment in believing that a threat is still ongoing. See, *Sheehan,* 575 U.S. at 613 ("The Fourth Amendment standard is reasonableness, and it is reasonable for police to move quickly if delay "would gravely endanger their lives or the lives of others." . . . The Constitution is not blind to "the fact that police officers are often forced to make split-second judgments."); *Heien v. North Carolina*, 574 U.S. 54, 60–61 (2014) ("To be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of government officials, giving them "fair leeway for enforcing the law in the community's protection."").

Indeed, California courts also recognized these principles. *Brown v. Ransweiler,* 171 Cal.App.4th 516, 528 (2009) ("We must never allow the theoretical, sanitized world of our imagination to replace the dangerous and complex world that policemen face every day. What constitutes "reasonable" action may seem quite different to someone facing a possible assailant than to someone analyzing the question at leisure." Internal quotations and citation omitted.).

Here, McBride literally had a split second between her fourth and fifth shots to make a judgment call of whether Hernandez continued to pose an immediate threat to her life and the lives of others. Given that the evidence *objectively* supports her belief, there can be no question that her last two shots were objectively reasonable. Even if she were mistaken, however, her mistake as to whether Hernandez continued to be a threat was also reasonable. Thus, there was no violation of the Fourth Amendment. To find otherwise and to let the Opinion stand, the Ninth Circuit would directly contradict the Supreme Court's findings and dictates in *Graham* and would be impermissibly viewing her actions with the benefit of reflection and hindsight. This is not the standard. Consequently, rehearing is warranted.

## IV. CONCLUSION

Given this Court's finding that "Hernandez continuously moved in a way that gave the objective appearance of trying to get up," there can be no question that Hernandez had not been "clearly incapacitated" when the final two shots were fired, but instead remained an imminent threat. The only conclusion in harmony with *Graham*, *Plumhoff*, and the multitude of cases is that all of McBride's shots were reasonable and did not violate the Fourth Amendment. Indeed, the High Court has expressly stated that where "lethal force is justified, officers are taught to keep shooting until the threat is over," and "need not stop shooting until the threat has ended." *Plumhoff*, 572 U.S. at 777. Thus, rehearing is warranted to address the conflict in the Panel's Opinion.

Dated: May 9, 2024        ORBACH HUFF & HENDERSON

By:  */s/ Kevin E. Gilbert*
      Kevin E. Gilbert
      Carolyn M. Aguilar
      Attorneys for Defendant-Appellee
      TONI MCBRIDE

Dated: May 9, 2024        CITY OF LOS ANGELES

By:  */s/ Colleen R. Smith*
      Colleen R. Smith
      Attorneys for Defendants-Appellees
      CITY OF LOS ANGELS and LOS
      ANGELES POLICE DEPARTMENT

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 11. Certificate of Compliance for Petitions for Rehearing/Responses

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form11instructions.pdf*

### 9th Cir. Case No. 21-55994, No. 21-55995

I am the attorney or self-represented party.

I certify that pursuant to Circuit Rule 35-4 or 40-1, **APPELLEES' BRIEF REGARDING REHEARING EN BANC** is *(select one)*:

[ **X** ] Prepared in a format, typeface, and type style that complies with Fed. R. App.
P. 32(a)(4)-(6) and **contains the following number of words: 4,193**.
*(Petitions and responses must not exceed 4,200 words)*

**OR**

[ ] In compliance with Fed. R. App. P. 32(a)(4)-(6) and does not exceed 15 pages.


**Signature**   /s/ *Kevin E. Gilbert*          **Date**          May 9, 2024
*(use "s/[typed name]" to sign electronically-filed documents)*